ZAGER, Justice.
An attorney removed from his elected position as Van Buren County Attorney challenges the district court order for his removal. Chapter 66 of the Iowa Code authorizes a district court to remove "[a]ny appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof" in certain circumstances. Iowa Code § 66.1A (2015). We must now decide whether an elected county attorney was properly removed under this statute for sexual harassment. For the reasons set forth herein, we conclude that the conduct of the county attorney, while deserving the disapproval it received from the district court, did not rise to the level of misconduct that would warrant the "drastic" and "penal" remedy of a court order removing an elected official from office. See State v. Callaway , 268 N.W.2d 841, 842 (Iowa 1978) (using these terms to characterize chapter 66). We reverse the judgment of the district court and vacate the order removing the defendant from the office of Van Buren *832 County Attorney. We remand the case for further proceedings consistent with this opinion.
I. Facts and Procedural Background.
In May 2013, Abraham Watkins was sworn into the Iowa bar and subsequently opened a solo practice in Keosauqua, Iowa. Watkins operated his law practice out of an office located on the first floor or main level of the two-story home he shared with his family. Watkins and his family mostly lived upstairs. However, the home's kitchen, laundry room, and one of the two bathrooms are located on the main level, adjacent to the office area. Watkins's wife, Renee Watkins, worked closely with her husband in the law office as the office manager for his private practice. In September 2014, Watkins hired twenty-year-old Jasmin Wallingford as his legal assistant. Two months later, Watkins was elected as the Van Buren County Attorney after running as an independent, and he assumed office on January 1, 2015.
Following Watkins's election as the Van Buren County Attorney, which is a part-time position, Renee began to split her time between serving as the office manager for her husband's private practice and the victim coordinator for the county attorney's office. Additionally, Wallingford began working part-time for Watkins in the county attorney's office, as well as part-time for him in his private law office.[1] Wallingford became close to the Watkins family, even labeling herself an "honorary family member." Wallingford and the Watkins family shared personal details of their lives with each other. During this time, Wallingford assisted Watkins and Renee with their young daughters and socialized with them outside of the office. These social events included out-of-town trips Wallingford took with the family in which they visited waterparks and stayed in hotels together.
Based on a recommendation from Chris Kauffman, a friend of Watkins, Watkins hired Virginia Barchman as a part-time assistant county attorney in April 2015. At the time, Barchman had been retired for five years after a twenty-four-year career as an attorney with the Iowa Attorney General's Office's Area Prosecutions Division. Barchman began working in the same first-floor office area shared by Watkins, Renee, and Wallingford, though tensions arose between Watkins and Barchman not long after Barchman's hiring. The pair engaged in a number of intense arguments that made it difficult for them to work together on cases.
Disagreements between Watkins and Barchman continued to escalate in the spring of 2016. Wallingford also began to look for other employment beginning in the spring of 2016. After a domestic-abuse trial that was held in the summer of 2016, Barchman expressed her frustrations with Watkins by criticizing his performance during the trial and accusing him of "smelling like booze."[2] In August, Barchman obtained permission from the Van Buren County Board of Supervisors (Board) to work in a different office space in the Van Buren County courthouse due to issues she had with the noise in Watkins's office and Watkins himself. She labeled this new workspace an "Abe-free zone." Watkins soon began seeking job applications for an assistant county attorney, *833 which Barchman interpreted to mean Watkins was looking to replace her.
Although Watkins disputed that he had been drinking during the trial, he clearly had an issue with alcohol abuse outside the workplace. Renee grew tired of Watkins's drinking habits, and the couple would constantly argue about their marital issues in the office. Finally, on August 5, Renee and the Watkinses' children left the home to visit Renee's family in North Carolina because Renee was exasperated with Watkins's drinking. As a result, Watkins contacted Kauffman, who helped Watkins receive medical care for his drinking issues. Watkins also contacted and met with Hugh Grady from the Iowa Lawyers Assistance Program. Grady recommended that Watkins immediately stop drinking, visit a counselor, attend Alcoholics Anonymous meetings, and maintain regular contact with him. Watkins took the necessary steps to follow through with these recommendations, beginning with his sobriety. Throughout these personal struggles during the summer of 2016, both Watkins and Renee confided in Wallingford for support.
On August 9, Wallingford resigned from her positions with Watkins. Wallingford stated in her resignation letter, "I have learned many things in my time here, including what makes a hostile work environment." As her reason for leaving, she wrote, "Due to aberrant behavior and a hostile work environment, I no longer can continue my position and feel confident about coming into work." Kauffman met with Wallingford around the time of her resignation and encouraged her to write down all of her complaints regarding Watkins. Wallingford prepared her list in the week following her resignation. Barchman turned over Wallingford's resignation letter to John Finney, the Van Buren County Auditor, and contacted her former colleague Scott Brown in the Iowa Attorney General's Office about the resignation letter and Wallingford's complaints with Watkins.
Wallingford's list totaled approximately fifty-five complaints about her work with Watkins over the previous two years. The overwhelming majority of her complaints involved her frustration with the menial work tasks she was given and the way they made her feel inferior to Watkins. These complaints included "criticizing me in front of customers," "constant yelling between him [and] Renee," "the importance of him [and] not us," "my #1 job was to be there to answer the phone," and "[he] very often expected me to figure [work] out then remind me I didn't go to law school." While the majority of Wallingford's complaints dealt with work assignments and the lack of respect she felt she received, several of the complaints involved conduct potentially amounting to sexual harassment.
Wallingford reported that twice Watkins came down the stairs and entered the office area to get coffee while wearing only athletic shorts or boxer briefs in the early morning. On one of those occasions, Wallingford laughed and Watkins walked over to her desk. However, he did not stay long. According to Wallingford, neither of these occurrences happened within six months of the filing of the petition for removal.
On another occasion, Watkins showed Wallingford two photographs of his naked wife and a video Watkins made of an incident where his wife accidentally squirted breast milk in Wallingford's car. The display of the photographs and the video occurred after work hours in the family kitchen while the family and Wallingford were having dinner together. Renee immediately objected to Watkins's display of the photographs, and the incident in the family kitchen ended upon her objection. Although the timing of this incident is unclear, *834 it did not occur within six months of the filing of the petition for removal.
Additionally, Watkins made several sexual comments to Wallingford. Some of these occurred in the workplace. On one occasion, Watkins told Wallingford that her "boobs [were] distracting him." On another occasion, after seeing a particular woman, Watkins told Wallingford, "Man, I wouldn't want to see her naked." Watkins also complained to Wallingford that his wife did not want to have sex and said he wished he had a wife who wanted to have sex with him all the time. On another occasion, Watkins made an inappropriate sexual pun about the name of a cleaning product in the presence of Wallingford and two women custodians. Wallingford took this as a poor attempt at humor, and she knew that the other women did not understand it.
At a birthday party for one of his daughters, which took place in a park on a Saturday, Watkins commented to Kauffman about the breasts of a courthouse employee. The following Monday, Watkins attempted to bring up the subject again in front of Renee and Wallingford. Renee cut him off and told Watkins she did not want to hear about it.
On a different occasion, Wallingford was speaking with Renee about Wallingford's visit to a gynecologist. Watkins overheard this conversation and began to pester Wallingford about what was wrong with her, at which point Renee made a comment along the lines that Wallingford had a "broken vagina." Watkins later asked Wallingford on another occasion whether "her vagina was still broke." Finally, after Renee left the family home with their daughters on August 5, Watkins contacted Wallingford by telephone on Sunday night. During the course of a long and wide-ranging discussion, Watkins made the comment that he was glad he had kept nude photographs of his old girlfriends.
As noted above, Wallingford submitted her letter of resignation on August 9. Wallingford subsequently attempted to retract her resignation after Barchman informed her that she could work with Barchman from an office in the old courthouse. However, Wallingford was not rehired. She soon found employment with the Van Buren County Sheriff's Office.
Barchman also witnessed some of the incidents described above. On one occasion, Barchman saw what she believed to be Watkins appearing downstairs in his underwear. She made her objections to his behavior clear to Watkins, and there is no indication that this ever happened again in her presence. Further, Watkins used a crude sexual term as a nickname for a particular female attorney in Barchman's presence. She told Watkins that this was offensive to her, and she never heard him use the expression again.
Watkins also asked Wallingford if her "vagina was still broke" on one occasion when Barchman was present. Moreover, Barchman saw a photograph of Watkins's wife while she was pregnant, nude, and covered in blue paint on Watkins's computer screen by accident when she went to his office to discuss something with him.
Barchman could not recall hearing Watkins ever make a single "come-on" line to any female employee or client. Her initial complaints in July 2016 were about Watkins's performance during the aforementioned domestic-abuse trial. Her concerns at the time related to Watkins's alleged drinking during the trial.
In mid-August, Barchman forwarded Wallingford's letter of resignation to Jon Swanson, the attorney for Van Buren County. Swanson then notified the Board, which took steps to investigate the allegations *835 against Watkins. The Board held two closed sessions to discuss the allegations and how to handle them. After the first closed session, the Board retained attorney Thomas H. Miller at the recommendation of Swanson to conduct a formal investigation and advise the Board on the best course of action.
Miller is a former Iowa Assistant Attorney General who has experience handling public-official misconduct. Miller was also Barchman's supervisor when the two worked in the Iowa Attorney General's Office. During his investigation, Miller spoke to a number of individuals in Van Buren County including Barchman, Wallingford, Kauffman, and the Van Buren County Sheriff. Miller never spoke with Watkins or Renee as part of his investigation. Further, Barchman incorrectly reported to Swanson and Miller that Watkins refused to cooperate with alcohol treatment recommendations made by Grady.
At the second closed session, Miller and the Board discussed the results of his investigation. During this discussion, Miller told the Board about possible ways to initiate removal proceedings of Watkins under Iowa Code section 66.3. One route included bringing the removal petition by five registered voters of the county as specifically provided for in section 66.3(3). Despite the existence of this method to initiate the proceedings, Miller advised the Board that through "a little bit of legal wrangling," the Board could initiate the removal proceedings by appointing an acting county attorney under Iowa Code section 331.754(4) and the acting county attorney would then be authorized to initiate the action to remove the elected county attorney. The Board decided to proceed on this basis.
For reasons that are not apparent from this record, Miller did not contact the Iowa Attorney General's Office to have it initiate the removal action as specifically authorized by Iowa Code section 66.3(1). This is the method most often used in removal actions. Rather, upon Miller's recommendation, the Board retained attorney F. Montgomery Brown as acting county attorney and authorized him to initiate the removal action utilizing the procedure outlined above.
After Brown met with Watkins and learned he would not resign voluntarily, Brown filed the petition to remove Watkins from office pursuant to Iowa Code sections 66.11 and 331.754(4) on September 29. Once Brown filed the removal proceedings, the district court appointed him to appear on the State's behalf and prosecute Watkins's removal proceedings pursuant to Iowa Code section 66.12.
In its final amended petition, the State sought removal of Watkins on five separate grounds. Four involved allegations that Watkins engaged in "willful misconduct or maladministration in office" in violation of Iowa Code section 66.1A(2) by (1) creating a "hostile work environment" that included sexual harassment, (2) supplying a minor with alcohol in violation of Iowa Code sections 123.47(1) and 123.47(2)(a ), (3) retaliation, and (4) accepting three private-practice cases that created conflicts of interest with his position as county attorney. The petition also sought Watkins's removal on the ground that he had been intoxicated in violation of Iowa Code section 66.1A(6).
Watkins filed a motion to dismiss the removal petition. The motion urged that the Board did not have the power to initiate a removal action under Iowa Code section 66.3, nor could the Board empower Brown to prosecute the action under Iowa Code section 331.754(4). Additionally, Watkins claimed a breach of contract by the county. Watkins alleged his signature on *836 the Van Buren County Employee Handbook and consideration in the form of legal services and compliance with the county's rules created a binding contract. Watkins further claimed the county breached this contract when it did not "promptly name an impartial investigator" as provided for in the handbook. Watkins cited Miller's former working relationship and friendship with Barchman. Moreover, Watkins argued the Board violated the handbook's employment policy of progressive discipline by initiating termination before taking other, less drastic measures.
On October 28, the district court denied Watkins's motion to dismiss. The district court ruled the Board had the authority to appoint an attorney under Iowa Code section 331.754(4) to act as county attorney when the elected county attorney had a conflict of interest. The district court ruled that Watkins had an "obvious" conflict of interest in this civil proceeding. The district court reasoned that Brown, as the lawfully appointed acting county attorney on the matter, had the same authority over the matter for which he was appointed under Iowa Code section 331.754(4) as the elected county attorney. Thus, the district court found that Brown was considered a county attorney for purposes of Iowa Code section 66.3(5).
Trial on the petition for removal commenced on October 31 and continued sporadically over the next several months with final submission of evidence occurring on December 22. On January 3, 2017, the district court issued its Order for Removal from Office. The district court ordered Watkins's removal from the office of Van Buren County Attorney solely based on the sexual-harassment claim. In reaching its decision, the district court found a "significant contrast between the recollections of the State's witnesses versus the recollections of Mr. Watkins; his wife; and current employee, Ms. Richardson." The district court found the State's witnesses more credible and considered their testimony to be truthful because nothing indicated the witnesses fabricated their testimony or had a substantial personal interest in the outcome in comparison to Watkins's witnesses, who, the district court noted, were not eager to testify.
In addition to the aforementioned complaints from Wallingford and Barchman, the district court also took into account testimony from Tayt Waibel and Kauffman. The district court found the testimony of Waibel, who had worked for Watkins in his private law office, to be truthful. Her testimony recounted inappropriate sexually charged remarks made by Watkins. One of those comments was directed at Waibel personally and occurred on a weekend after Watkins was served with removal papers. After making the inappropriate statement, Watkins acknowledged, "This is probably why I'm in trouble for sexual harassment." Moreover, the district court relied on testimony from Kauffman, who testified that Watkins liked to talk about sex, frequently offered to show him naked pictures of his wife, and once commented on the breasts of a courthouse employee.
In its decision to remove Watkins from office, the district court reasoned,
During his tenure as County Attorney, Mr. Watkins has engaged in a pattern of conduct that is unacceptable by any reasonable standard. Many people, probably most, would consider much of his conduct to be outrageous or even shocking. The fact that Mr. Watkins is an attorney trained in the law makes his behavior all the more troublesome. Iowa's Rules of Professional Conduct for attorneys recognize that lawyers holding public office assume legal responsibilities going beyond those of other citizens.
*837 A lawyer's abuse of public office can suggest an inability to fulfill the professional role of a lawyer. I.R.P.C. 32:8.4 Comment 5.
The State has proven that Mr. Watkins has engaged in misconduct or maladministration by regularly committing sexual harassment. The bigger question is whether his conduct was willful, which requires proof that he acted intentionally with a purpose to do wrong. ...
... Mr. Watkins's inappropriate conduct was pervasive and existed over a significant period of time thereby negating any claim of mistake or an isolated lapse of judgment. His actions were clearly intentional. As a lawyer he knew better but continued to subject his two young female employees to sexually related banter, and in some instances images, that have no place in the work setting. This is especially true for a county attorney's office. Given the extent and stunning nature of his conduct one can, and in the Court's opinion must, infer that he was acting with a bad or evil purpose. Therefore, the State has established that his conduct was willful.
The State withdrew its retaliation claim at closing, conceding that it failed to prove Watkins retaliated against Barchman. The district court did not further address the retaliation allegation or the State's claim that Watkins supplied a minor with alcohol in violation of Iowa Code sections 123.47(2)(a) and 123.47(5). Additionally, the court made no findings of fact regarding the allegations that Watkins committed willful misconduct or maladministration in office based on the conflicts-of-interest claim against him, finding instead that none of the allegations justified Watkins's removal. The district court also found insufficient evidence to establish the State's intoxication allegation, noting that "substantial evidence," including the testimony of the presiding judge at the trial, established that Watkins was not intoxicated in court.[3] The district court also did not make any findings regarding the Board's alleged breach of the handbook or the conflicts of the Board members who helped initiate the removal proceedings. Additional facts will be included within our following analysis. Watkins timely filed an appeal, which we retained.
II. Standard of Review.
Our standard of review for rulings on questions of statutory interpretation is for correction of errors at law. State v. Iowa Dist. Ct. , 889 N.W.2d 467, 470 (Iowa 2017). In removal proceedings, the State bears the burden of proof to establish that the public official committed the charged acts of misconduct or maladministration in office with "willful intent to do wrong [and] an evil purpose upon the part of the accused, ... by clear, convincing, satisfactory evidence." State ex rel. Crowder v. Smith , 232 Iowa 254, 255, 4 N.W.2d 267, 268 (1942). This standard requires the State to establish the facts "by more than a preponderance of evidence, but something less than establishing a factual situation beyond a reasonable doubt." State v. Bartz , 224 N.W.2d 632, 638 (Iowa 1974).
In determining whether the State has met this burden, we review the evidence submitted in a removal proceeding de novo. Callaway , 268 N.W.2d at 842.
There is essentially but one question before us as triers [d]e novo on this appeal: Does the record compiled below contain sufficient evidence of misconduct on the part of [the] defendant[ ] ... as [an] elected public official[ ] to necessitate *838 [his] removal from office under the provisions of Chapter 66.
Bartz , 224 N.W.2d at 634. To answer this question, we give the trial court's findings weight "but nonetheless assume the responsibility of reviewing the entire record in determining the case anew on appeal." Id.
III. Analysis.
Watkins presents a number of issues on appeal. First, Watkins challenges the manner in which the removal action was initiated. Second, Watkins disputes the district court's determination that his conduct amounted to willful misconduct or maladministration in office. See Iowa Code § 66.1A(2). Third, Watkins contends the district court should have dismissed the removal action because Van Buren County did not retain an impartial investigator to investigate the allegations of sexual harassment as promised in the employee handbook. Fourth, he asserts the district court should have dismissed the removal action because it was tainted by a conflict of interest. Fifth, Watkins claims the district court should have dismissed the removal action because the Board failed to implement the progressive disciplinary procedures set forth in the handbook before initiating the removal process. Finally, Watkins argues he is entitled to attorney's fees on the dismissed grounds for removal.
A. The Initiation of Removal Proceedings. Watkins contends the district court erred when it denied his motion to dismiss the removal action against him because the Board unlawfully initiated the removal proceedings. He maintains that the Board could not empower an acting county attorney appointed under Iowa Code section 331.754(4) to initiate removal proceedings because only the elected county attorney or attorney general may initiate removal proceedings as the sole complainant under Iowa Code section 66.3. Watkins also argues allowing the Board to appoint an acting county attorney to prosecute the removal proceedings under section 331.754(4) would render the special-prosecutor provision of section 66.12 superfluous. We begin our analysis by reviewing the relevant statutes regarding removal and the appointment of an acting county attorney.
Iowa Code section 331.754(4) provides, "The board may appoint an attorney to act as county attorney in a civil proceeding if the county attorney and all assistant county attorneys are disqualified because of a conflict of interest from performing duties and conducting official business." Iowa Code § 331.754(4). Iowa Code section 66.3 is specific to removal and states the following:
The petition for removal may be filed:
1. By the attorney general in all cases.
2. As to state officers, by not fewer than twenty-five electors of the state.
3. As to any other officer, by five registered voters of the district, county, or municipality where the duties of the office are to be performed.
4. As to district officers, by the county attorney of any county in the district.
5. As to all county and municipal officers, by the county attorney of the county where the duties of the office are to be performed.
Id. § 66.3. Finally, Iowa Code section 66.12 states, "When the proceeding is brought to remove the county attorney, the court may appoint an attorney to appear in behalf of the state and prosecute such proceedings." Id. § 66.12.
Nothing in Iowa Code section 66.3 distinguishes between elected and acting county attorneys. "When a proposed interpretation of a statute would require the *839 court to 'read something into the law that is not apparent from the words chosen by the legislature,' the court will reject it." State v. Iowa Dist. Ct. , 730 N.W.2d 677, 679 (Iowa 2007) (quoting State v. Guzman-Juarez , 591 N.W.2d 1, 2 (Iowa 1999) ). Still, incorporating section 331.754(4) into section 66.3 could potentially allow a county board of supervisors to circumvent the limits of section 66.3 since "county boards of supervisors" are not among the entities authorized to bring removal petitions. See Iowa Code § 66.3. Nonetheless, in this case we do not have merely the Board's action appointing Brown pursuant to section 331.754(4). The district court also appointed Brown pursuant to section 66.12. Therefore, without deciding whether Brown would have had authority to pursue the removal action if the court had not appointed him under section 66.12, we decline Watkins's request to hold the removal petition should have been dismissed based on lack of authority.
B. Removal from Office. Iowa Code section 66.1A states,
Any appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof, may be removed from office by the district court for any of the following reasons:
1. For willful or habitual neglect or refusal to perform the duties of the office.
2. For willful misconduct or maladministration in office.
3. For corruption.
4. For extortion.
5. Upon conviction of a felony.
6. For intoxication, or upon conviction of being intoxicated.
7. Upon conviction of violating the provisions of chapter 68A.
Iowa Code § 66.1A. "A proceeding to remove a public officer under this statute is a drastic one and is penal or quasi-criminal in character." City of Des Moines v. Dist. Ct. , 241 Iowa 256, 262, 41 N.W.2d 36, 39 (1950). "Removal is drastic and penal." Callaway , 268 N.W.2d at 842. "The object 'is to rid the community of a corrupt, incapable or unworthy official.' " Id. (quoting State v. Welsh , 109 Iowa 19, 21, 79 N.W. 369, 370 (1899) ). "[T]he remedy provided by statute for the removal of duly elected public officials is heroic in nature and relatively drastic in a system where the usual method of removing officeholders is by resort to the ballot." Bartz , 224 N.W.2d at 638.
We have previously emphasized the summary and expedited nature of removal and noted that it "implement[s] a legislative intent that a public officer guilty of willful misconduct or maladministration be removed during the same term of office in which the conduct occurred that provided grounds for removal." State ex rel. Doyle v. Benda , 319 N.W.2d 264, 266 (Iowa 1982). Essentially, removal proceedings exist to provide a remedy when the misconduct is serious enough that waiting until the next election is inadequate. See id. (noting that removal proceedings are designed to occur before the next election and are mooted if the official is voted out of office or reelected with knowledge of the alleged wrongdoing). They are meant to protect public interests, and those interests are imperiled when a public official's "administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position." State ex rel. Barker v. Meek , 148 Iowa 671, 680, 127 N.W. 1023, 1026 (1910).
The State bears the burden of proof in removal proceedings to establish the alleged wrongdoer's "willful intent to do wrong [and] an evil purpose upon the *840 part of the accused, ... by clear, convincing, satisfactory evidence." Smith , 232 Iowa at 255, 4 N.W.2d at 268. This standard of proof is defined as "the establishment of facts by more than a preponderance of the evidence, but something less than establishing a factual situation beyond a reasonable doubt." Bartz , 224 N.W.2d at 638. Moreover, with regard to section 66.1A(2), the phrase "in office" modifies both "willful misconduct" and "maladministration," so the State bears the additional burden of showing by clear, convincing, and satisfactory evidence that the alleged wrongdoer's acts were committed within the scope of his or her official responsibilities. See, e.g. , State ex rel. Gebrink v. Hospers , 147 Iowa 712, 714, 126 N.W. 818, 819 (1910) (noting removal "should be exercised only in cases of official wrongdoing established by clear and satisfactory evidence").[4] Therefore, the public official's alleged wrongdoing must take place within his or her capacity as a public official and not when the official was acting as a private citizen. *841 As we have noted, the district court removed Watkins from office for sexual harassment, either rejecting or not reaching the other grounds. The State does not argue on appeal that any of those other grounds should have been sustained. Thus, our sole duty on appeal is to decide whether the allegations of sexual harassment are such as to constitute willful misconduct or maladministration in office warranting removal from office.
1. Defining "willful misconduct or maladministration." We have defined "willfully" in the removal context to mean that the public official must act "intentionally, deliberately, with a bad or evil purpose, contrary to known duty." State v. Roth , 162 Iowa 638, 651, 144 N.W. 339, 344 (1913). In the removal context, "[c]onduct may be voluntary, thoughtless, or even reckless, yet not necessarily willful. Nor does unlawfulness necessarily imply willfulness." Meek , 148 Iowa at 674, 127 N.W. at 1024 (citation omitted).
We have routinely applied a subjective-intent standard to examine the public official's purpose when he or she engaged in the charged acts to determine whether the official intentionally and deliberately committed those acts. For example, in Roth , we held that the removal of a mayor and chief of police was improper based on claims that they were "willfully" neglecting to prevent baseball from being played on Sundays when such activity may or may not have been illegal on the Sabbath day. 162 Iowa at 651, 144 N.W. at 344. In doing so, we examined the subjective intent of the public officials, noting that the city officials were acting in good faith based on their uncertainty of the law at issue rather than neglecting to enforce it. Id.
Further, in State ex rel. Cochran v. Zeigler , we held the state failed to demonstrate willful misconduct in office to justify the removal of a mayor based on allegations that the mayor violated the law by having an interest in contracts for goods or services to be furnished or performed for the city. 199 Iowa 392, 397, 202 N.W. 94, 96 (1925). We reached this conclusion based on the lack of evidence in the record "to indicate a corrupt purpose upon the part of [the mayor], or that fraud or imposition was practiced upon the city." Id. Moreover, in State v. Manning , we held the state failed to show public officials acted willfully to justify their removal for willful and habitual neglect, maladministration, and corruption in office because we could not find a "purpose, on the part of said officials in what they did, to harm, or which was inimical to the interests of such city." 220 Iowa 525, 528, 259 N.W. 213, 215-16 (1935).
Thus, it is not a question of whether a reasonable person would find that the public official acted contrary to his or her duties or even unlawfully. Nor is it a question of how outrageous or inappropriate the public official's conduct is perceived by our court or others in the community. Rather, the first issue before us hinges on the public official's subjective intent to act with a bad or evil purpose to commit his or her charged acts of wrongdoing contrary to a known duty.
In addition to the public official's subjective intent at the time of the charged misconduct or maladministration, we must also discern whether the public official acted contrary to a known duty when he or she engaged in these acts. See Roth , 162 Iowa at 651, 144 N.W. at 344. More specifically, we have held that removal "should be exercised only in cases of official wrongdoing established by clear and satisfactory evidence." Hospers , 147 at 714, 126 N.W. at 819. To illustrate, in Callaway , we found willful misconduct or maladministration in office to justify removal where a sheriff repeatedly assaulted prisoners without justification *842 by kicking, striking, and punching them, spraying them in the face with mace, and kneeing them in the groin. 268 N.W.2d at 843-47, 848. In reaching this decision, we noted the sheriff's treatment of the prisoners violated various laws, including his legal duty "to protect prisoners from insult and annoyance." Id. at 847. Likewise, we found removal was justifiable for willful misconduct or maladministration in office when county supervisors loosely managed funds and falsely claimed payment for mileage that they had not travelled. Bartz , 224 N.W.2d at 636, 637-38, 638-39.
Similarly, in State ex rel. Duckworth v. Smith , we affirmed the removal of a county treasurer for willful misconduct or maladministration in office after the county treasurer acted alongside a treasurer's office employee to withdraw funds from the county treasurer's office for private purposes. 219 Iowa 5, 7, 257 N.W. 181-82 (1934). In reaching our conclusion, we noted the county treasurer repeatedly took money from the treasurer's office "after he had been told that such action was unlawful" and "after being warned by the state checkers." Id. at 7, 257 N.W. at 182. We also looked at the treasurer's knowledge of his own wrongdoing, noting certain actions by the treasurer "seem[ed] to indicate knowledge on [his] part ... that the abstraction of funds from the treasurer's office was not proper." Id. at 6, 257 N.W. at 181.
In summary, to remove a public official from office for willful misconduct or maladministration in office, the State has the burden to prove by clear, convincing, and satisfactory evidence that the official committed the charged acts "intentionally, deliberately, with a [subjectively] bad or evil purpose, contrary to known duty." Roth , 162 Iowa at 651, 144 N.W. at 344 ; see Smith , 232 Iowa at 255, 4 N.W.2d at 268.
2. The definition of sexual harassment in the Iowa Rules of Professional Conduct. In determining that Watkins committed willful misconduct or maladministration in office through his charged acts, the district court applied the standard for sexual harassment set forth in the Iowa Rules of Professional Conduct rather than the employment law standard for a hostile-work-environment sexual-harassment claim. We have defined the term "sexual harassment" in the context of professional misconduct cases to "include any physical or verbal act of a sexual nature that has no legitimate place in a legal setting." Iowa Supreme Ct. Att'y Disciplinary Bd. v. Moothart , 860 N.W.2d 598, 604 (Iowa 2015). The standard for sexual harassment established under the rules does not include the necessary analysis of the accused's intent that is required in the removal context to determine whether the accused acted "intentionally, deliberately, with a bad or evil purpose, contrary to a known duty." Roth , 162 Iowa at 651, 144 N.W. at 344.
Further, the professional rules "are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." Iowa R. Prof'l Conduct ch. 32, Scope [20]. The "[v]iolation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached." Model Rules Prof'l Conduct Scope [20] (Am. Bar Ass'n 2016); see also Stender v. Blessum , 897 N.W.2d 491, 504 (Iowa 2017) (holding that a violation of the rules of professional conduct "cannot be used to establish a per se claim for legal malpractice"); Ruden v. Jenk , 543 N.W.2d 605, 611 (Iowa 1996) (holding the rules of professional conduct do "not undertake to define standards of civil liability"). An additional remedy exists within the attorney *843 disciplinary system for any ethical violations that Watkins committed.
3. The definition of sexual harassment in employment law. Employment law recognizes two different forms of sexual harassment under Title VII of the Civil Rights Act and the Iowa Civil Rights Act (ICRA), namely, quid pro quo and hostile or abusive work environment. See McElroy v. State , 637 N.W.2d 488, 499 (Iowa 2001) ; see also Vivian v. Madison , 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluating the ICRA."). The State alleges Watkins created a hostile or abusive work environment. It does not accuse Watkins of engaging in quid pro quo sexual harassment, so our analysis in this case focuses only on the legal standards governing a sexually hostile work environment.
" 'A hostile work environment is a cumulative phenomenon,' and a series of individual episodes of inappropriate behavior eventually can amount to a hostile environment." Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n , 895 N.W.2d 446, 470 (Iowa 2017) (quoting Alvarez v. Des Moines Bolt Supply, Inc. , 626 F.3d 410, 421 (8th Cir. 2010) ). Hostile-work-environment claims "recognize[ ] workplace discrimination affects the full spectrum of disparate treatment in the workplace and target[s] discrimination that requires employees to work in a discriminatorily abusive or hostile workplace." Farmland Foods, Inc. v. Dubuque Human Rights Comm'n , 672 N.W.2d 733, 743 (Iowa 2003). Such claims are "actionable when the sexual harassment is so severe or pervasive as to alter the conditions of employment and create an abusive working environment." McElroy , 637 N.W.2d at 499.
"The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.' " Meritor Sav. Bank, FSB v. Vinson , 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986) (quoting 29 C.F.R. § 1604.11(a) (1985) ). "A recurring point in [the jurisprudence governing sexually hostile work environments] is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the" employment conditions to create an abusive work environment. Faragher v. City of Boca Raton , 524 U.S. 775, 787-88, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (quoting Oncale v. Sundowner Offshore Servs., Inc. , 523 U.S. 75, 82, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) ). "The correct inquiry is whether [complainant] by her conduct indicated that the alleged sexual advances were unwelcome." Meritor Sav. Bank , 477 U.S. at 68, 106 S.Ct. at 2406.
To establish a hostile work environment, the plaintiff must show: (1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment.
Farmland Foods , 672 N.W.2d at 744. Such harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Id. at 743 (alteration in original) (quoting Harris v. Forklift Sys., Inc. , 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) ). The standards governing a hostile work environment are intended to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender- *844 related jokes, and occasional teasing.' " Burlington N. & Santa Fe Ry. v. White , 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (quoting Faragher , 524 U.S. at 788, 118 S.Ct. at 2283-84 ).
Accordingly, the plaintiff must establish that "he or she subjectively perceived the conduct as abusive, [and] that a reasonable person would also find the conduct to be abusive or hostile." Farmland Foods , 672 N.W.2d at 744. To determine whether a reasonable person would find the challenged conduct to be abusive or hostile, the fact finder must examine all of the circumstances,
including: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating or whether it was merely offensive, and (4) whether the conduct unreasonably interfered with the employee's job performance. These factors and circumstances must disclose that the conduct was severe enough to amount to an alteration of the terms or conditions of employment. Thus, hostile-work-environment claims by their nature involve ongoing and repeated conduct, not isolated events.
Id. at 744-45 (citations omitted).
The district court ruling in this case did not actually find the State proved the elements of a hostile-work-environment sexual-harassment claim.
4. Sufficiency of the evidence to warrant removal. In determining whether the State has met its burden to remove Watkins from office, the dispositive question is whether the record contains "sufficient evidence of misconduct on the part of [the] defendant[ ] ... as [an] elected public official[ ] to necessitate [his] removal from office under the provisions of Chapter 66." Bartz , 224 N.W.2d at 634. We certainly agree that sexual harassment can be the basis for removal from office under chapter 66. The applicable legal standard, though, is not that found in the rules of professional conduct or in civil employment law. Rather, it is the standard found in chapter 66. In this case, the district court did not discuss our precedents interpreting chapter 66 and its precursors.
Instead, the district court focused on three things. First, it emphasized that Watkins repeatedly engaged in "unacceptable behavior." As the district court explained, "[T]he citizens of any county have a strong interest in ensuring that their elected officials behave appropriately." Second, the court noted that Watkins's conduct could create monetary liability for the county. Third, the district court observed that Watkins was an attorney and the Iowa Rules of Professional Conduct prohibit "any physical or verbal act of a sexual nature that has no legitimate place in a legal setting" regardless of whether a sexual-harassment claim is established as defined in the civil rights laws. Moothart , 860 N.W.2d at 604.
To be clear, sexual harassment in any form is never acceptable or appropriate behavior. It is important that our court system, like all institutions, protect and support victims of sexual harassment. Watkins's actions and statements were disgraceful, disrespectful, and inappropriate. Certainly, we do not condone such behavior. As morally reprehensible as we find Watkins's behavior, this is not the standard by which we need to analyze whether the State has met its high burden to establish whether Watkins committed willful misconduct or maladministration in office by creating a sexually hostile work environment. We are a court of law, not a court of public opinion. We now analyze the facts of this case and apply the legal standards applicable to removal actions.
*845 Determining whether a public official engaged in willful misconduct or maladministration in office is necessarily fact specific. As already noted, Watkins's conduct did not amount to a criminal violation and the claim that Watkins committed sexual harassment has not been adjudicated. See City of Des Moines , 241 Iowa at 262, 41 N.W.2d at 39 ("A proceeding to remove a public officer under this statute is a drastic one and is penal or quasi-criminal in character."). Also, many of the incidents involved situations that occurred outside of the workplace or in the context of Watkins's friendship with certain witnesses rather than in the office or in his official capacity as county attorney. See, e.g. , Hospers , 147 Iowa at 714, 126 N.W. at 819 (stating removal "should be exercised only in cases of official wrongdoing"). While not excusing Watkins's egregious conduct, the record does not establish that Watkins was guilty of grave misconduct, demonstrated flagrant incompetence, or was otherwise unfit to perform his duties as county attorney. See Meek , 148 Iowa at 680, 127 N.W. at 1026 (noting the interests of the public are imperiled when a public official's "administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position"). Finally, what the State must prove by clear, convincing, and satisfactory evidence is that Watkins committed his charged acts "intentionally, deliberately, with a bad or evil purpose, contrary to known duty." Roth , 162 Iowa at 651, 144 N.W. at 344 ; see Smith , 232 Iowa at 255, 4 N.W.2d at 268.
By all accounts, the Law Office of Abraham Watkins/the county attorney's office was an unstructured environment. Wallingford got along well with Watkins and considered herself a close friend to Renee. The individuals in the office teased and played pranks on each other. Watkins, Renee, and Wallingford discussed intimate details of their lives with one another. They socialized with one another on a frequent basis, including at least one or two overnight trips that included the Watkinses' children.
The events that led to Wallingford's resignation began on August 5. It was on that date that Watkins and Renee were in a major verbal fight. Renee decided to remove herself and the children from the home and visit her family out of state. Alcohol abuse by Watkins was a factor in Renee's decision to leave. By this time, Wallingford was fed up with the tension and arguing in the office by all concerned. But the tipping point for her was an insulting remark that Watkins made to her over the weekend about her father. By Monday evening, Wallingford decided to resign from her position and contacted Kauffman and Barchman regarding her decision. Kauffman advised her at that time to write down all of her complaints about Watkins, which she did the following week.
Of the fifty-plus complaints that Wallingford listed about Watkins, approximately eleven were the incidents of sexual harassment that we have discussed. Significantly, Wallingford acknowledged at trial that when she was referring to a "hostile work environment" in her letter of resignation, she was referring to the yelling and uncomfortableness in the office and not a hostile work environment in the sexual-harassment sense.
Most of the highly inappropriate comments and photographs Watkins needlessly and insensitively subjected Wallingford to did not concern Wallingford herself. In addition, many of the comments were not made during work but in various nonwork contexts such as at an evening dinner at Watkins's home, personal phone calls over the weekend, and at a birthday party for Watkins's daughter.
*846 There is no evidence that Watkins sought to misuse his office or his position of power or authority to obtain anything from Wallingford or anyone else. The testimony reveals that Watkins believed his sexual comments and jokes were made in the context of his personal relationship with Wallingford-because he believed that was the type of relationship they had: one in which they joked, teased, and made sarcastic remarks to one another in the office. He was wrong of course; his comments and actions crossed way over the line. However, Watkins's state of mind is a relevant consideration in determining his culpability under chapter 66. Another underlying problem was that Watkins used part of the first floor of his home as the county attorney office. This turned out to be a bad arrangement, but it had been approved by the Board.
Based on our close review of the entire record, we are not persuaded that Watkins acted "with a bad or evil purpose, contrary to known duty," which requires more than a showing that Watkins acted intentionally. Roth , 162 Iowa at 651, 144 N.W. at 344. Nor are we persuaded that he committed many of the charged acts within the scope of his official responsibilities as the county attorney. See, e.g. , Hospers , 147 Iowa at 714, 126 N.W. at 819.
Therefore, we must reverse the district court's order removing Watkins from the office of county attorney. The State failed to meet the high burden required to show "by clear, convincing, satisfactory evidence" that Watkins intended to commit willful misconduct or maladministration in office based on the record. See Smith , 232 Iowa at 255, 4 N.W.2d at 268. As we have previously held, "[c]onduct may be voluntary, thoughtless, or even reckless, yet not necessarily willful." Meek , 148 Iowa at 674, 127 N.W. at 1024. While we agree that Watkins's conduct was voluntary, thoughtless, and offensive, the evidence does not show that he conducted himself in such a way that it was done willfully with an evil purpose.
Again, it is not our function on appeal to judge whether the conduct of Watkins was unprofessional, inappropriate, offensive, or rude. Nor is it for us to determine whether this is behavior we would expect in a private law office, let alone in the office of an elected county attorney. Clearly, we would hope for and expect much better. Our obligation is to follow the law that requires the State to meet its high burden of proof in removal proceedings to establish Watkins's "willful intent to do wrong [and] an evil purpose upon the part of the accused ... by clear, convincing, satisfactory evidence." Smith , 232 Iowa at 255, 4 N.W.2d at 268. Removal proceedings exist primarily to protect public interests, and those interests are imperiled when a public official's "administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position." Meek , 148 Iowa at 680, 127 N.W. at 1026. The State failed to meet its high burden to demonstrate corruption, negligence, or incompetence warranting the drastic and penal remedy of removal of Watkins from office as the Van Buren County Attorney.
Notably, our decision to reverse the district court removal of Watkins from office
does not mean that [his] actions ... are not beyond the reach of the persons [he was] elected to serve. At the next election, [his] actions are subject to review by the electorate. Under the separation-of-powers doctrine, "electoral control [is] an important restraint on [the] conduct [of elected officials]."
Residential & Agric. Advisory Comm., LLC v. Dyersville City Council , 888 N.W.2d 24, 51 (Iowa 2016) (Wiggins, J., *847 concurring specially) (fourth alteration in original) (quoting Teague v. Mosley , 552 N.W.2d 646, 650 (Iowa 1996) ).
In our democratic system of government, it is vitally important that the judiciary not be seen as imposing standards of conduct on elected officials, even if those standards are firmly grounded. We are judges, not guardians of behavior for elected officials. We do not believe the legislature intended to allow courts to remove elected officials for crude, outrageous, or even shocking behavior by itself. Nor do we believe the potential for governmental monetary liability should be the basis for invoking chapter 66. There are many instances where the conduct of public officials exposes the government to financial liability; only a few warrant the drastic remedy of removal. The facts of this case do not warrant such a drastic remedy under our precedent.
Chapter 66 places significant authority in the hands of the judiciary. We must keep in mind the possibility that this authority could be misused in a partisan way to benefit one political faction or one elected official at the expense of another. The judiciary should exercise considerable restraint in such disputes.
In conclusion, based upon our de novo review of the entire record, the evidence did not establish willful misconduct or maladministration in office within the meaning of section 66.1A(2). The State's evidence was insufficient to meet the high bar necessary for the removal of Watkins from his elected office. Consequently, we reverse the judgment of the district court, vacate the district court's order removing Watkins from the office of Van Buren County Attorney, and remand the case for entry of an order dismissing the petition for removal and reinstating Watkins as Van Buren County Attorney.
C. Watkins's Additional Claims Regarding His Removal. Due to our decision reversing the district court and vacating the order for removal of Watkins, we need not address Watkins's remaining arguments for reversal.
D. Attorney's Fees. Under Iowa Code section 66.23, "[i]f the petition for removal is dismissed, the defendant shall be reimbursed for the reasonable and necessary expenses incurred by the defendant in making a defense, including reasonable attorney's fees, as determined by the court." Iowa Code § 66.23. The district court found that only one of the State's five grounds for removal actually warranted removal and, thus, denied Watkins's motion for attorney fees. It held that attorney's fees can only be awarded under section 66.23 if the petition is dismissed in its entirety. Since we now decide to vacate Watkins's removal and remand the case to the district court to enter an order dismissing the entirety of the removal petition against him, Watkins is entitled to the reasonable and necessary expenses, including attorney's fees, that he incurred throughout his defense. See id. On remand, the district court must determine appropriate attorney's fees.
IV. Conclusion.
For the aforementioned reasons, we reverse the district court's judgment and vacate its removal order of Watkins from the office of Van Buren County Attorney. We also remand the case for his reinstatement as Van Buren County Attorney, as well as a determination of Watkins's reimbursement for the reasonable attorney's fees and any other reasonable and necessary expenses he incurred throughout his defense of these proceedings.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Waterman and Mansfield, JJ., join this opinion. Appel, J., files a special concurrence. Cady, C.J., files a dissenting opinion in which Hecht, J., joins. Wiggins, J., files a dissenting opinion.
APPEL, Justice (concurring specially).
*848 If this was an ordinary employment relationship, an employer might well fire Abraham Watkins. But here we are dealing with an elected official. And while the statute itself permits removal as a result of "willful misconduct or maladministration," Iowa Code § 66.1A(2) (2015), these elastic terms have been dramatically narrowed by our caselaw to establish the highest possible requirement for judicial removal.
We have required what amounts to "specific intent" to do wrong in a criminal or quasi-criminal way and the need for heroic action by the court to save the day. "A proceeding to remove a public officer under this statute is a drastic one and is penal or quasi-criminal in character." City of Des Moines v. Dist. Ct. , 241 Iowa 256, 262, 41 N.W.2d 36, 39 (1950). "Removal is drastic and penal." State v. Callaway , 268 N.W.2d 841, 842 (Iowa 1978). "[T]he remedy ... is heroic in nature and relatively drastic in a system where the usual method of removing officeholders is by resort to the ballot." State v. Bartz , 224 N.W.2d 632, 638 (Iowa 1974).
Yet I view this as a close case. I do not agree with all of Justice Zager's gloss on the facts. In particular, I agree with much of what Chief Justice Cady says about the use of sexual humor to objectify and demean women. I part company with Chief Justice Cady primarily as a result of my view of the extraordinarily demanding standard for removal as articulated in our caselaw and its application to the facts of this case. On the narrow but critical legal issue of the appropriate standard for removal, I am closer to Justice Zager.
Because of my differences with both major opinions in this case, I do not join either of them. In the end, however, I conclude that Watkins's behavior approaches, but does not cross, the heroic and stringent penal or quasi-criminal standard for removal articulated in our historic caselaw.
I want to make clear that today should not be regarded as a vindication for Watkins. By the narrowest of margins, he has escaped heroic, quasi-penal judicial removal from his office of county attorney. In short, this case should be a model for county attorneys of how not to conduct themselves in office.

With the approval of the county board of supervisors, Watkins used his home office as his county attorney office.

Wallingford, among others, later testified that Watkins was never intoxicated during the trial. The trial resulted in convictions of the defendant on all counts.

As previously noted, the testimony of the witnesses confirmed that Watkins was never intoxicated during the trial, and the trial resulted in convictions on all counts.

The standard we have described requiring the public official to have committed the misconduct within the scope of official responsibilities under chapter 66 generally comports with those followed in other jurisdictions. See, e.g. , Ala. Const. art. VII, § 173 (a) (allowing for the removal of certain public officials "for willful neglect of duty, corruption in office, incompetency, or intemperance in the use of intoxicating liquors or narcotics to such an extent, in view of the dignity of the office and importance of its duties, as unfits the officer for the discharge of such duties for any offense involving moral turpitude while in office, or committed under color thereof, or connected therewith"); Kan. Stat. Ann. § 60-1205 (West, Westlaw through 2018 Reg. Sess.) (providing Kansas public officials, "except those subject to removal from office only by impeachment," must forfeit office if they "(1) willfully engage in misconduct while in office, (2) willfully neglect to perform any duty enjoined upon such person by law, (3) demonstrate mental impairment such that the person lacks the capacity to manage the office held, or (4) ... shall commit any act constituting a violation of any penal statute involving moral turpitude"); Utah Code Ann. § 10-3-826 (West, Westlaw through 2018 Gen. Sess.) ("In case any municipal officer shall at any time wilfully omit to perform any duty, or wilfully and corruptly be guilty of oppression, malconduct, misfeasance, or malfeasance in office, the person is guilty of a class A misdemeanor, shall be removed from office, and is not eligible for any municipal office thereafter."); id. § 77-6-1 ("All officers of any city, county, or other political subdivision of this state not liable to impeachment shall be subject to removal as provided in this chapter for high crimes and misdemeanors or malfeasance in office."); State ex rel. Hardie v. Coleman , 115 Fla. 119, 155 So. 129, 132 (1934) (en banc) ("Malfeasance [as grounds for removal of a public official] has reference to evil conduct or an illegal deed .... [Further,] misfeasance has reference to the performance by an officer in his official capacity of a legal act in an improper or illegal manner. ..."); Maddox v. Williamson Cty. Bd. of Comm'rs , 131 Ill.App.3d 816, 86 Ill.Dec. 782, 475 N.E.2d 1349, 1355 (1985) (defining "malfeasance" and "misfeasance" as grounds for removal in the same manner as Florida did in Hardie ); Woodward v. Commonwealth , 984 S.W.2d 477, 479 (Ky. 1998) (holding a public official is guilty of malfeasance when he or she "perform[s] an official act" and the act is "wrongful, unjust or constitute[s] gross negligence"); Ekstedt v. Village of New Hope , 292 Minn. 152, 193 N.W.2d 821, 828 (1972) (finding a public employee can be discharged for just cause or misconduct when that cause is "one which specially relates to and affects the administration of the office, and [is] restricted to something of a substantial nature directly affecting the rights and interests of the public. The cause must be one touching the qualifications of the officer or his performance of its duties, showing that he is not a fit or proper person to hold the office." (quoting State ex rel. Hart v. Common Council , 53 Minn. 238, 55 N.W. 118, 120 (1893) )); Daugherty v. Day , 145 W.Va. 592, 116 S.E.2d 131, 135 (1960) (holding justification for the removal of a public official includes official misconduct or evil actions in connection with official duties, including "unlawful behavior by a public officer in relation to the duties of his office, willful in character." (quoting Kesling v. Moore , 102 W.Va. 251, 135 S.E. 246, 248 (1926) )).