# IN THE COURT OF APPEALS OF IOWA

No. 22-0892
Filed August 9, 2023

**STATE OF IOWA,**
  Plaintiff-Appellee,

**vs.**

**SYDNEY LEIANN SLAUGHTER,**
  Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Kellyann M. Lekar, Judge.

A defendant appeals her conviction for a making a false claim for a slot machine jackpot. **REVERSED AND REMANDED.**

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Martha E. Trout, Assistant Attorney General, for appellee.

Considered by Bower, C.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

"So who's my lucky winner?" This question was standard for the casino worker who approached Sydney Slaughter and Anthony McNeese after the jackpot light flashed on their slot machine. As it turns out, that question would later be posed to a jury as the State charged Slaughter with falsely claiming the jackpot when McNeese made the wager. *See* Iowa Code § 99F.15(4)(h) (2020). The jury found Slaughter guilty. She now alleges four errors: (1) section 99F.15(4)(h) did not encompass her conduct; (2) the State offered insufficient proof she had the intent to defraud; (3) the State failed to prove that she did not make a wager contingent on winning at the slot machine; and (4) the district court allowed a special agent for the State to testify to the meaning of "wager."

Because the State did not present sufficient evidence of guilt, we reverse.

I.   **Facts and Prior Proceedings**

In the early morning hours of November 29, 2020, McNeese played a slot machine at the Isle of Capri Casino and won a $4000 jackpot.[1] Slaughter, his girlfriend, was by his side, and took his seat in front of that machine after the "candle" on top signaled a jackpot win.[2]

---

[1] Under Iowa law, when an individual wins $1200 or more in a single game, it is a taxable event that must be documented; the jackpot winner is identified, and their personal information is collected. Iowa Code § 422.16(1)(d) ("State income tax shall be withheld on winnings in excess of twelve hundred dollars derived from slot machines authorized under chapter 99F."); *see id.* § 99F.18.

[2] Special Agent John Bergman with the Iowa Division of Criminal Investigation (DCI) testified that when a single spin on a slot machine returns a jackpot "the machine freezes up and requires human intervention on the part of a casino employee."

Alerted by that signal, slot machine attendant Danielle Rademaker arrived and asked who won the jackpot. To Rademaker, Slaughter "really seemed kind of flustered" but said she won the money. Slaughter then filled out the casino's paperwork with her name and Social Security number. She designated 95% of the winnings to be withheld for federal income tax.[3] Meanwhile, Rademaker requested surveillance video of the casino floor, believing she had seen McNeese—not Slaughter—playing the machine. Confirming Rademaker's suspicion, the surveillance team determined that McNeese had been sitting at the machine before the candle flashed. Slaughter later admitted to casino supervisor Jesse McCarvel that McNeese had hit the button on the machine. With that information, Rademaker and McCarvel told McNeese that he had to be the one to claim the jackpot. So he did, designating $3800 (95% of the winnings) for federal income tax withholding.

Critical to the prosecution theory, McNeese owed $1386 to the Iowa Department of Human Services (DHS)[4] bureau of collections for child support and $41,446 to the Linn County Clerk of Court in unpaid fines when he claimed this jackpot. Those debts qualified as setoffs under Iowa Code section 99F.19(2).[5] Casino employees are required to check an electronic database to see if jackpot winners have such setoffs. *See* Iowa Code § 99F.19(1)–(2); *see also id.* § 8A.504.

---

[3] The casino automatically deducts five percent from the jackpot for state taxes. Special Agent Bergman testified: "The other 95% is up to the patron."

[4] The agency is now known as the Iowa Department of Health and Human Services

[5] Iowa Code section 8A.504(1)(d)(1) defines "qualifying debt" to include "[a]ny debt . . . which the child support recovery unit is otherwise attempting to collect." Iowa Code section 8A.504(1)(d)(3) also lists "[a]ny debt which is in the form of a liquidated sum due, owing, and payable to the clerk of the district court."

But casino service manager Akaesha Mergen testified that because McNeese "wanted a hundred percent in taxes taken out," the casino could not hold any money for the setoffs.

Another critical piece to this theory was that this jackpot was not a first-time event for Slaughter or McNeese. In fact, Slaughter won a $2,000 jackpot the previous night. McCarville attended to that payout and handed Slaughter an "offset letter"[6] notifying her that the casino withheld $1050 that she owed to the Linn County Clerk of Court. And as for McNeese, he won seven jackpots between July and November that year.

The State charged Slaughter with making a false claim of winning the jackpot under Iowa Code section 99F.15(4)(h).[7] Before trial, Slaughter moved to exclude evidence of McNeese's setoffs. The court overruled her motion. And after three days of trial, the jury found Slaughter guilty as charged. She now appeals.

## II. Analysis

### A. Applicable Gambling Statute

The State charged Slaughter under this provision:

> A person commits a class "D" felony and, in addition, shall be barred for life from excursion gambling boats and gambling structures under the jurisdiction of this commission, if the person does any of the following:
> . . . .
> h. Claims, collects, or takes, or attempts to claim, collect, or take, money or anything of value in or from the gambling games . . . , with intent to defraud, without having made a wager contingent on winning a gambling game . . . .

---

[6] The parties use the term "offset" interchangeably with the statutory term "setoff."
[7] Special Agent Bergman testified that he also charged McNeese with a gambling offense.

Iowa Code § 99F.15(4)(h). Here, the statute defines "gambling game" as "any game of chance authorized by the" state racing and gaming commission. *Id.* § 99F.1(14). The commission has authorized slot machines as a game of chance for play in casinos. Iowa Admin. Code r. 491-11.5.

On appeal, Slaughter asserts that this language did not proscribe the actions alleged by the State.[8] She argues that paragraph (h) covers only circumstances when a person claims to win when they have not—or claims a larger amount than they won—intending to defraud the actual winner or the casino.[9] Instead, she claims "the intent to avoid offset obligations" is covered by paragraph (o), enacted two years after the incident at issue. *See* 2022 Iowa Acts ch. 1143, § 7. She also cites paragraph (n) that the legislature added in that 2022 amendment. *See id.*

Under those new paragraphs, a person commits a class "D" felony if that person does either of the following:

> n. Knowingly or intentionally passes a winning wager or share to another person or provides fraudulent identification in order to avoid the forfeiture of any money or thing of value as a voluntarily excluded person pursuant to the processes established under section 99F.4, subsection 22.
> o. Knowingly or intentionally passes a winning wager or share to another person or provides fraudulent identification in order to avoid the application of a setoff as provided in section 99F.19.

*Id.* (codified at Iowa Code § 99F.15(4)(n), (o) (2022)).

---

[8] If Slaughter had preserved error on her statutory-interpretation argument, our review would be for correction of errors at law. *State v. Watkins*, 914 N.W.2d 827, 837 (Iowa 2018).

[9] Paragraph (h) was a part of the original gambling regulations enacted in 1989. *See* 1989 Iowa Acts ch. 67, § 15. Aside from a change in its paragraph designation from (i) to (h) in 2015, *see* 2015 Iowa Acts ch. 44, the language has remained unchanged.

It is true that we examine amendments "with an eye toward determining the legislative design which motivated the change." *Jenney v. Iowa Dist. Ct.*, 456 N.W.2d 921, 923 (Iowa 1990). "When an amendment to a statute adds or deletes words, a change in the law is presumed unless the remaining language amounts to the same thing." *Davis v. State*, 682 N.W.2d 58, 61 (Iowa 2004). In other words, we assume that the legislature "sought to accomplish some purpose and [the amendment] was not a futile exercise." *Id.* In Slaughter's view, the legislature would not have needed to add new alternatives if the prohibited conduct was covered by existing language.[10] *Cf. State v. Smith*, 08-1757, 2009 WL 3337632, at *3 (Iowa Ct. App. Oct. 7, 2009) ("If section 99F.15(4)(i) covered any situation where the defendant claimed more than he or she 'legitimately won,' what would be the need for a separate prohibition on cheating in section 99F.15(4)(d)?").[11]

While Slaughter's argument has some allure, we agree with the State that it is not preserved for our review. Slaughter claims that her conduct did not amount to the offense charged in the trial information. "If it appears from the indictment or information and the minutes of evidence that the particulars stated do not constitute the offense charged . . . or that the defendant did not commit that

---

[10] Maybe. Or maybe not. Our supreme court has recognized from time to time the "belt-and-suspenders" canon when interpreting statutes. *See Anderson v. Iowa Dist. Ct.*, 989 N.W.2d 179, 183 (Iowa 2023) ("[L]egislatures may opt for redundant drafting in relation to previously enacted statutes." (citation omitted)); *but see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 178 (2012) (writing that "words with no meaning—language with no substantive effect—should be regarded as the exception rather than the rule").

[11] *Smith* involved a casino patron cheating at blackjack by increasing his "caps" after seeing he had a favorable hand. 2009 WL 3337632, at *1. Our court decided that paragraph (h) (then paragraph (i)) did not apply because Smith won the amount he claimed, just not within the rules of the game. *Id.* at *3.

offense," then the appropriate response is a motion to dismiss. *State v. Majeres*, No. 01-1805, 2002 WL 31031048, at *2 (Iowa Ct. App. 2002) (citation omitted) (distinguishing a challenge to the sufficiency of the evidence). Because Slaughter did not move to dismiss the trial information, this issue is not properly before us.

## B. Sufficiency of the Evidence

Focusing then on paragraph (h), we turn to Slaughter's substantial-evidence challenge. To convict Slaughter, the jury had to find that the State proved beyond a reasonable doubt these elements:

1. On or about the 29th day of November, 2020, Sydney Slaughter or someone Sydney Slaughter aided and abetted, conspired with, or entered into a common design with, did claim, collect or take or attempt to claim, collect or take money from a gambling game.
2. Sydney Slaughter or someone Sydney Slaughter aided and abetted, conspired with, or entered into a common design with had the specific intent to defraud.[12]
3. The money was claimed, collected or taken or was attempted to be claimed collected or taken without Sydney Slaughter having made a wager contingent on winning a gambling game.

On appeal, Slaughter challenges the State's proof of elements two and three. She contends the State did not offer substantial evidence to show that she acted with specific intent to defraud or had knowledge of McNeese's intent to defraud. She also claims the evidence was insufficient to show that she did not make a wager contingent on a gambling game.

We review challenges to sufficiency of the evidence for correction of errors at law. *State v. Dalton*, 674 N.W.2d 111, 116 (Iowa 2004). We view the evidence in the light most favorable to the State to determine if there was substantial

---

[12] While the marshalling instruction included a conspiracy alternative, the other instructions only defined aiding and abetting.

evidence that could "convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt." *Id.* (citation omitted). This standard means that evidence must do more than raise "suspicion, speculation, or conjecture" to a reasonable jury. *State v. Leckington*, 713 N.W.2d 218, 221 (Iowa 2006).

### 1. *Intent to defraud*

The State had the burden to prove that in attempting to claim the jackpot, Slaughter acted either with a specific intent to defraud or knew about McNeese's intent to defraud. The term "defraud" is not defined in Iowa Code chapter 99F. Nor do we have case law defining "intent to defraud" in the context of our gambling statutes. But our supreme court *has* discussed the meaning of "intent to defraud" when construing the crime of fraudulent practices. *See State v. Hoyman*, 863 N.W.2d 1, 8 (Iowa 2015) (interpreting Iowa Code section 714.8). There, the court accepted Hoyman's distinction between the "intent to deceive" and the "intent to defraud." *Id.* at 9. The court explained that "to deceive means to mislead, whereas to defraud means to mislead with the further purpose of obtaining some gain from the victim of deceit." *Id.* We find that definition helpful to our analysis of the identical phrase here.

Before addressing the parties' appellate contentions, we return to the trial for some framing. In closing argument, the prosecutor told the jury that defraud "just means, in this case, cheat, try to get away with something for financial gain that you know you're not entitled to." The prosecutor continued:

> Now, who did she try to defraud? Was it child support? . . . What about the Linn County Clerk of Court for unpaid fines? . . . Was the intent to defraud the IRS so that Anthony McNeese wouldn't have to pay taxes on his winnings? Was the intent to defraud the casino and

say, hey, look, pay me money even though I'm not the one who claimed—the one who placed the bet?

In answering those rhetorical questions, the prosecutor told the jury: "It doesn't matter. The burden is not on the State to prove who they were intending to defraud, only that she was cheating at gambling by falsely claiming a winning and she did it anyway."

To counter, the defense closing argument drew the jury's attention to the instruction on specific intent: "[I]t means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind." *See State v. Fountain*, 786 N.W.2d 260, 264 (Iowa 2010) (delineating between general and specific intent). Defense counsel then synopsized the prosecution theory: "[T]he State has tried to tell you that the specific purpose that Ms. Slaughter had in mind—that she and McNeese had in mind—well, that was to try and prevent him from having to pay his offset." But counsel insisted that the State did not prove its theory: "Have you seen any evidence whatsoever that Ms. Slaughter knew that Mr. McNeese had an offset?"

Slaughter reprises that argument on appeal. She acknowledges that because she'd just paid her own setoff the night before, "she was aware of the concept of offsets *generally*." But she maintains that "the record evidence failed to establish that she was aware that *McNeese had any offset* outstanding against him." Slaughter also contends that the State failed to prove that she knew about McNeese's outstanding debts or that she had been with him when he had won his previous jackpots.

The State can seldom prove specific intent by direct evidence. *State v. Crawford*, 974 N.W.2d 510, 518 (Iowa 2022). So "proof of intent usually arises from circumstantial evidence and inferences reasonably drawn from the circumstances." *Id.* To that end, we examine Slaughter's actions and the surrounding circumstances to determine whether there was substantial evidence to prove her specific intent. *See id.* We look at her conduct before and after the alleged crime, and, in the case of aiding and abetting, active encouragement, participation, or assent to the crime. *See id.*

The State first points us to Slaughter's association with McNeese. The record shows they came to the casino together. Special Agent Bergman narrated the surveillance video of their interactions while playing the slot machines. He noted that over the course of two hours they engaged in many "public displays of affection." Then came the event at issue. As described in the State's brief: "McNeese scored a jackpot and then moved to a different slot machine two seats away while Slaughter slid into the chair in front of the winning machine and claimed the jackpot."

But we are not persuaded that the jury could reasonably infer—just from their close association that night and her act of taking McNeese's seat—that Slaughter had the specific intent to mislead McNeese's creditors and further to obtain a gain from them on his behalf. *See Hoyman*, 863 N.W.2d at 9. The State had to prove Slaughter or someone she aided and abetted had the specific intent to defraud the beneficiaries of McNeese's setoffs—the DHS and the Linn County

clerk of court.[13]  To prove Slaughter's specific intent, the State had to show that she knew about McNeese's setoffs.  *See id.*

The State notes that both McNeese and Slaughter won jackpots at the casino the night before, implying that Slaughter could have been present when the casino presented McNeese with the "offset letter" listing his debts.  But that implication lacks support in the record.  As Slaughter points out, the State offered no evidence that McNeese and Slaughter were together when they won their jackpots on November 28.  In fact, the State offered no proof of their interactions beyond those at the casino on November 29.  For Slaughter to know of McNeese's intent to defraud his creditors, she would need to have heard or seen information about his setoffs.  The State offered no such proof.  Indeed, prosecution witnesses admitted they could not be sure whether Slaughter knew about McNeese's debts or his intent to defraud his creditors that night.

We also look to Slaughter's actions before and after the November 29 jackpot.  Although not the main focus of its argument, the State contends that Slaughter knew it was improper to claim someone else's winnings because she had won her own jackpot the night before.  We find that fact insufficient to prove her specific intent to defraud.  Supervisor McCarvel testified that after her first jackpot win, he gave Slaughter a letter explaining her setoffs were paid.  That letter, which was entered into evidence, did not mention any consequences for claiming the winnings from someone else's wager.  As for her conduct after the second

---

[13] Recall that the trial prosecutor asserted that the State did not have to identify the intended victim of the fraud.  But, on appeal, the State limits its argument to McNeese's creditors: "The inference to draw is that by having Slaughter collect the jackpot, McNeese could avoid paying the offset."  We hold the State to that theory.

jackpot win, it does not cement her intent to defraud. Switching chairs and her flustered demeanor raised no more than a suspicion of wrongdoing. And "[s]uspicion is no substitute for proof." *State v. Barnes*, 204 N.W.2d 827, 829 (Iowa 1972). Without proof that she knew about McNeese's setoffs, reasonable doubt exists as to the purpose behind Slaughter's actions.

Because the State failed to offer substantial evidence of Slaughter's specific intent to defraud, we reverse and remand for entry of a judgment of acquittal. Although we could end our opinion here, we find it necessary to address Slaughter's arguments on the third element of the offense for the sake of thoroughness. *Cf. Matter of Dethmers Mfg. Co.*, 985 N.W.2d 806, 818 (Iowa 2023) (continuing analysis "[i]n the interest of thoroughness); *W. Bend Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 624 N.W.2d 422, 425 (Iowa Ct. App. 2001) (continuing analysis because we found it "useful and necessary").

### 2. Wager contingent on winnings

Slaughter next contests the State's proof that she attempted to claim the jackpot without having made a wager contingent on winning a gambling game. This second sufficiency claim dovetails with Slaughter's evidentiary challenge to an expert's opinion on the definition of making a wager. Because defining that phrase is essential to assessing the sufficiency of the State's evidence, we start with Bergman's challenged testimony.[14]

---

[14] Generally, we review evidence rulings for an abuse of discretion. *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). We find an abuse when the grounds for the ruling are "clearly untenable or to an extent clearly unreasonable." *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001) (citation omitted).

As its first witness, the State called Special Agent Bergman for his expertise on the basics of gambling. After he described the general workings of the casino floor and slot machines, the prosecutor asked: "So when is a wager actually placed?" Over a defense objection, Bergman offered this response:

> [I]n the context of a slot machine, the wager is placed when the machine is caused to go into its, for lack of a better term, I'll say spin. So it could be when a button is pushed to cause that machine to play, or maybe in the case of a machine with a handle that's pulled, it would be when the handle is deployed. It's not when the credits are inserted into the machine. It's when the button is actually pushed.

On cross examination, defense counsel tried to clarify that Bergman was simply giving his opinion on when a wager is placed. But Bergman responded: "No, ma'am. There is case law that specifically defines when a wager has occurred."

> This exchange followed:
>
> Q. Well, you would agree with me, Agent, that it is not your job to tell the jury today what the law they should follow is; is that right?
> A. That's not my job.
> Q. So when you tell them that's when a wager is placed, you are not telling them that is the law they should be following. Is that fair to say?
> A. I'm telling them that in my twenty-two years of experience in my job, that's the definition of when a wager is placed.

Later, when moving for judgment of acquittal, defense counsel recounted his objection to the special agent's definition of wager:

> In terms of the last element, that it had to be done without having made a wager contingent on winning, that has not been proven either. Bergman did state that he believes a wager means each time you press the button. He said there was case law that said that. Apparently, Mr. Bergman is better than I am at researching cases because I haven't been able to find a case that says a definition of a wager. If Ms. Slaughter had been the one who placed the money in the machine, that could have been considered her making a wager. We have heard no testimony whatsoever as to who put the money in

the machine, who made that wager; therefore, the State has not met their burden, and no reasonable jury could find Ms. Slaughter guilty, and we ask that you grant the motion for a directed verdict.

The district court decided the State had generated a fact question for the jury. But defense counsel revisited the wager issue in closing argument:

So then we turn to the third element, that Ms. Slaughter had not made a wager contingent on winning. Members of the Jury, these Jury Instructions are the law. This is the law that the Judge has instructed you to follow. Witnesses do not get to make the law. Witnesses do not get to tell you what the law is. So while Agent Bergman can sit up there and tell you that, in his opinion, a wager is when you press a button, that is not the law listed in these Jury Instructions.

So Members of the Jury, is it reasonable to think that Ms. Slaughter could have believed she made a wager if it was her money placed into that machine? If her money was placed into that machine and she thought, if this wins, that's my money. I made that wager. I paid for that game. Well, then she has made a wager contingent on winning, and the State has not met their burden.

As we discussed, you didn't hear any evidence to tell you whose money was in there, so maybe it was Ms. Slaughter's, maybe it wasn't. We don't know, and it was the State's burden to make sure that you did know . . . .

And the State did not let the wager issue go, offering this rebuttal:

[McNeese is] the one who's playing [the machine], and we all know, not just from the testimony of a twenty-year veteran of DCI who does nothing but gaming for a living, that gambling means you've got the money in the machine you're sitting at, you're pushing the button.

After the jury returned its guilty verdict, the defense moved for a new trial, complaining that the court allowed Bergman to define "wager—a legal term of art and an element of the offense" not otherwise described in the jury instructions. The court overruled the new-trial motion.

On appeal, Slaughter attacks this wager question on two fronts. First, she argues the record lacks evidence as to whether she made a wager or not. Second,

she contends the district court abused its discretion in allowing the State's expert, to give his opinion on a legal definition. We tackle her second contention first.

As an overarching principle, Iowa courtrooms embrace expert witnesses for their specialized knowledge that helps jurors in their factfinding. *In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). Experts may provide opinions that reach an ultimate issue. Iowa R. Evid. 5.704. But there are limits. "Experts are not to state opinions as to legal standards." *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 600 (Iowa 2017) (citing Iowa R. Evid. [5.]704, advisory committee's comment (1983)). When deciding whether an expert witness has overstepped, we consider whether the opinion relies on a term with "a separate, distinct, and specialized meaning in the law different from" its ordinary meaning. *Palmer*, 691 N.W.2d at 420. We also consider whether the term was essential to an element of the charge and whether it was a "fighting issue at trial." *Id* at 421.

We see no problem with Special Agent Bergman discussing his experience with the gaming bureau and the relevant investigation. But his definition of wager fell outside the scope of admissible testimony by providing an opinion on a legal standard essential to the charged offense. *Id.* The State had to prove that Slaughter did not make "a wager contingent on winning a gambling game." Iowa Code § 99.F15(4)(h). Who made the winning wager was a contested issue. And it was the role of the court—not an expert witness—to provide that legal standard for the jury.

Making the situation worse, Bergman testified that "case law" supported his definition of making a wager as pushing the button on a slot machine.[15] Like defense counsel at trial, our legal research located no cases defining "wager" for the purposes of chapter 99F. When our supreme court did consider the meaning of "wager" in another context, it used the word interchangeably with "bet." *State ex rel. Turner v. Drake*, 242 N.W.2d 707, 709 (Iowa 1976). *Drake* defined a bet as "an agreement to pay something of value upon the happening or non-happening of a specified contingent event." *Id*. at 710. Other jurisdictions define "wager" consistent with this idea. *See*, *e.g.*, *Overturf v. Cal. Horse Racing Bd.*, 150 Cal. Rptr. 657, 660 (Cal. Ct. App. 1978) ("The noun 'wager' means 'something (as a sum of money) that is risked on an uncertain event.'" (citation omitted)); *State v. Amman*, 68 N.E.2d 816, 818 (Ohio Ct. App. 1946) ("A wager is something hazarded on the issue of some uncertain event . . . ." (citation omitted)); W. Va. Code § 29-22D-3 (2023) ("'Wager' means a sum of money or thing of value risked on an uncertain occurrence.").

Under this authority, making a wager or bet involves reaching an agreement to risk something of value on an uncertain result. When that agreement is reached would vary depending on the situation. Yet the court let Special Agent Bergman offer a narrow definition focused on the action that triggered the slot machine's spin. His definition confined the term to just one area where wagering occurs. Presumably, a different action would constitute making a wager for horse races or

---

[15] We fear the term "case law" itself could be misconstrued by the jurors. *See Palmer*, 691 N.W.2d at 419 (establishing primary reason that legal conclusions are inadmissible is because they may be "misunderstood by the witness and the jury").

sports betting. *See* Iowa Code §§ 99D.11 (pari-mutuel wagering), 99F.1(28) (sports wagering). Even under our liberal view of expert testimony, Bergman's opinion on when a wager is placed did not assist the jury in deciding if Slaughter violated the statute.[16] But because we reverse on sufficiency grounds, the inadmissibility of his opinion only matters for our review of the third element of the offense. And as we review the evidence, "we are mindful that criminal statutes are to be strictly construed with doubts resolved in favor of the accused." *State v. Schultz*, 604 N.W.2d 60, 62 (Iowa 1999).

Turning back to the sufficiency question, we review the record to see if the State proved beyond a reasonable doubt that Slaughter tried to claim the jackpot without having made a wager contingent on winning a gambling game. We recognize that "[a]s a practical matter it is never easy to prove a negative." *State v. Boone*, 989 N.W.2d 645, 651 (Iowa 2023) (citation omitted). But if Slaughter risked something of value contingent on winning at the slot machine, regardless of who pushed the button, then she is not guilty of the felony charged. *See Drake*, 242 N.W.2d at 709. The State bore the burden to show that she did not have any "skin in the game" so to speak.

Slaughter argues it was unclear from the record whether she made the wager that led to the jackpot. She notes that she was standing near the machine

---

[16] Even the State recognized in its rebuttal closing argument that making a wager might encompass more than pushing the button on the slot machine: "There's no way, no evidence whatsoever, none, that Sydney Slaughter had any money in the machine, that she was pushing any buttons, that she was doing anything." But that concession disappears on appeal. The State now argues: "If she did not hit the button to win the jackpot, she did not make a wager as the statute requires." We reject that cramped view.

before the candle lit.  And she asserts that she and McNeese had been sharing other machines throughout the night.

Slaughter also points to times, captured on the surveillance video, when the pair was shuffling in pockets and purses, leading to an uncertainty about where the money for the jackpot came from.  Even after the jackpot win, the two appeared to be gambling in tandem, standing at the same machines while McNeese dug into his pockets.  McNeese even handed Slaughter his winnings so that she could put them in the machine to redeem them before they left for the night.  While Slaughter admitted to casino staff that she did not push the button for the jackpot, the State presented no evidence of whose money went into the machine.  On this record, we find reasonable doubt that Slaughter did not make a wager contingent on winning at the slot machine.

The State failed to land the second and third elements of this gambling offense.  So it can't hit jackpot.  We reverse Slaughter's conviction and remand for entry of judgment of acquittal.

**REVERSED AND REMANDED.**

Bower, C.J., concurs; Greer, J., dissents.

**GREER, Judge** (dissenting).

I must dissent from the majority opinion because I view the circumstantial evidence in this case as sufficient support for the conviction. First, in the casino video of the events of that evening, Anthony McNeese took the seat to play the gambling machine and Sydney Slaughter was not by his side. Slaughter came up shortly after McNeese started playing the machine and only stood watching him as he played. As she watched the gambling, Slaughter hugged McNeese, and she later admitted she was with him that night, which was confirmed by other video footage at the casino. The video also establishes that Slaughter did not hand McNeese any coins[17] to play the machine as she stood next to him. Once the machine's candle lit up to show a $4000 jackpot had been won, McNeese moved two seats away from the machine and from Slaughter's passive standing position. Then, Slaughter moved into the seat. When approached by the slot attendant who handles the process involved with the jackpot collection, Slaughter was asked if she was the one who "pushed the button and won the money"; she lied by replying "yes." She pulled out her identification card, gave the slot attendant her Social Security number, and signed the slot request form to collect the money, effectively claiming the jackpot. After having the surveillance team view the video, the casino service supervisor shift manager (supervisor) approached Slaughter; he testified about what took place after he approached, saying:

> I approached her, and I said, were you the one that had hit this jackpot? Like, were you the one that had hit the button? She seemed really kind of flustered, kind of out of sorts. She said, I—I think so, and then I went on to explain to her that it is against the law

---

[17] "Coins" and "credits" seem to be used interchangeably as the testimony was "the coins played is how many credits they played."

to claim somebody else's jackpot due to, like, tax evasion, everything like that. And eventually, she ended up telling me, no, it was actually Anthony that had hit it; that she was claiming it for him.

After this admission, no one told the casino crew that Slaughter had advanced the coin to McNeese to play the machine. On top of all of that background, the slot request form showed that only one coin had been played to access the jackpot. Thus, McNeese must have inserted his coin as he began playing the machine before Slaughter walked up to him.

With the results of the surveillance video on hand, the supervisor "informed [Slaughter and McNeese] that we knew it wasn't her that won that; it was him; and he would have to claim the jackpot." A second slot request form was filled out with McNeese's information and, as the slot attendant testified, McNeese complied but was not "happy." As the majority notes, McNeese owed several offsets that would have cleaned out the remaining jackpot earnings. At the supervisor's request, McNeese signed the form confirming he was the person who actually won the jackpot and directed all of the rest of the money toward his federal tax liability.[18] That meant no credit would be paid on the offsets—here the child support he owed or the Linn County fines assessed against him. And as was emphasized at trial, for Slaughter, because she won a jackpot the night before and cleared out the potential offsets against any winnings, had she actually won the $4000 jackpot, she could have been paid all of it but for the mandatory 5% paid for state tax liability. It benefitted McNeese to direct Slaughter to accept the winnings and

---

[18] The State of Iowa requires that 5% of the winnings be paid for state tax liability.

defraud those owed the offsets. If Slaughter were in on the scheme, a jury could properly find she entered into a common design with a specific intent to defraud.

I agree that the case resolution comes down to if Slaughter had the intent to defraud, but we know that intent cannot often be shown directly. *See State v. Ernst*, 954 N.W.2d 50, 55 (Iowa 2021) ("Specific intent is seldom capable of direct proof." (citation omitted)). We view the challenges to sufficiency of the evidence supporting a jury verdict "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (citation omitted). We can make "legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Ernst*, 954 N.W.2d at 54 (citation omitted). So, here the circumstantial evidence in my view allows a jury to deduce that Slaughter attempted to claim money from the gambling game with the intent to defraud by avoiding the payment of those winnings towards McNeese's court-ordered offsets. *See id.* at 55 (opining that circumstantial evidence, along with the reasonable inferences drawn from that evidence, is often part of proof of specific intent). A jury could find from Slaughter's demeanor that she participated in a deception to access more cash and that she knew of the scheme. Why would she be so quick to claim the jackpot? How else can we rationalize her actions of moving into the seat and lying to the casino staff?

Recognizing the jury instructions are the law of the case, I would find substantial evidence that Slaughter aided and abetted McNeese in a common

design with the specific intent to defraud.[19]  *See State v. Crawford*, 974 N.W.2d 510, 520–21 (Iowa 2022) (discussing that jury instructions become the law of the case for purposes of review for sufficiency of the evidence).  The jury was told that they could consider "the facts and circumstances surrounding the act to determine [Slaugther's] specific intent."  And the instructions guided the jury to consider if the State proved "[1] such specific intent or [2] 'aided and abetted' [the commission of the crime] with the knowledge the others who directly committed the crime had such specific intent."  Considering Slaughter's experience with jackpots and offsets, it does not take a large leap for a jury to conclude that when McNeese moved two chairs away after scoring the jackpot on the gambling machine and Slaughter quickly moved into the seat at the winning machine, the act was done with the intent to help McNeese avoid the imposition of the offsets, exceeding $40,000, against his winnings.  The majority is not persuaded that a jury could infer from the close association between McNeese and Slaughter and Slaughter's act of taking McNeese's seat that she had the requisite specific intent.  But, there is more.  Slaughter then falsely represents she scored the jackpot and, more

---

[19] The instruction provided:

The State must prove all of the following elements of Gambling, False Claim of Winnings:

1. On or about the 29th day of November, 2020, Sydney Slaughter or someone Sydney Slaughter aided and abetted, conspired with, or entered into a common design with, did claim, collect or take or attempt to claim, collect or take money from a gambling game.

2. Sydney Slaughter or someone Sydney Slaughter aided and abetted, conspired with, or entered into a common design with had the specific intent to defraud.

3. The money was claimed, collected or taken or was attempted to be claimed collected or taken without Sydney Slaughter having made a wager contingent on winning a gambling game.

importantly, then when confronted with the potential she committed a crime, took back the statement the jackpot was hers. A jury could find otherwise, true, but the circumstantial evidence here is substantial and supports this conviction that Slaughter aided McNeese to avoid his offsets against his winnings. *See State v. Dohlman*, 725 N.W.2d 428, 430 (Iowa 2006) ("Evidence is not insubstantial merely because we may draw different conclusions from [the evidence]; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." (alteration in original) (citation omitted)).

Finally, Slaughter also contends the State offered insufficient evidence that she did not make a wager. On that element, we have Slaughter's statement that McNeese had hit the jackpot and she was only claiming it for him. Thus, I would find substantial evidence supports Slaughter's conviction given that both Slaughter's and McNeese's actions as shown on the video and through how the forms were processed point to him as having made the wager.

After considering the evidence presented in the light most favorable to the jury's verdict, including the reasonable inferences that can be drawn, I would affirm the conviction because I believe it was supported by substantial evidence on all elements. I dissent on these grounds.