# In the Iowa Supreme Court

No. 23–0605

Submitted March 26, 2025—Filed June 6, 2025

**Valerie Rheeder,**

Appellee,

vs.

**Shellene Gray, City of Marion, Douglas Slagle,** and **Joseph McHale,**

Appellants.

Interlocutory appeal from the Iowa District Court for Linn County, Valerie L. Clay, judge.

Four defendants appeal the district court's refusal to dismiss a plaintiff's claims for workplace sexual harassment and retaliation. **Reversed and Remanded.**

May, J., delivered the opinion of the court, in which all justices joined.

Kacy L. Flaherty-Tarpey (argued) and Margaret A. Hanson of Dentons Davis Brown PC, Des Moines, for appellant Gray.

Holly A. Corkery (argued) and Amy L. Reasner of Lynch Dallas, P.C., Cedar Rapids, for appellants City of Marion and McHale.

Bridget R. Penick (argued) and Olivia N. Norwood of Fredrikson & Byron, P.A., Des Moines, for appellant Slagle.

Ann E. Brown (argued) of Ann Brown Legal PC, Cedar Rapids, for appellee.

**May, Justice.**

A custodian for a city police department sued the city and some of its employees. The custodian claims that she experienced sexual harassment and retaliation in violation of the Iowa Civil Rights Act (ICRA). The defendants argue that the district court should have dismissed the custodian's claims.

We agree with the defendants. Viewing the record in the light most favorable to the custodian, the alleged harassment was not sufficiently severe or pervasive to support an ICRA claim. Similarly, the alleged acts of retaliation did not amount to a materially adverse action as required for an ICRA claim. So we reverse and remand for dismissal.

## I. Background Facts and Procedural History.

**A. Rheeder Begins Work.** Valerie Rheeder began working for the City of Marion in 2018. Rheeder worked as a custodian for the Marion Police Department. At that time, the department's chief of police was Joseph McHale, the deputy chief was Douglas Slagle, and the administrative manager was Shellene Gray.

Rheeder reported to Michael Kula, another custodian. And Kula reported to Gray. Chief McHale and Deputy Chief Slagle were at the top of Rheeder's chain of command.

**B. Rheeder's First Interactions with Slagle.** Initially, Rheeder and Slagle were friendly toward each other, just like Rheeder was with other department employees. But then, two months after she started her job, the tone of the relationship changed. Slagle asked for her personal phone number. And then he started texting her.

A month later, Slagle started saying and doing things that made Rheeder uncomfortable. For instance, Rheeder asserts that Slagle would seek

opportunities to shake her hand. And during those handshakes, Slagle would linger longer than necessary. On one handshaking occasion, Rheeder claims that Slagle tapped her foot with his foot several times.

Rheeder also recalls an incident that happened while she was taking out the garbage behind the department. As Rheeder recalls the exchange, Slagle pulled up and said, "Why don't you hop in the car and we'll take a trip." Rheeder responded, "Oh we'll have an adventure." In reply, Slagle suggestively repeated, "Oh we'll have an adventure."

**C. Rheeder's Interactions with Slagle Take a Sharper Turn.** By early January 2019, now five months into her employment, Rheeder's interactions with Slagle became even more uncomfortable for Rheeder. Around January 8, Slagle asked to speak with Rheeder in his office. Rheeder alleges that the following exchange occurred:

- Slagle told her that he had thought about her "too much" over the holidays and wanted to reach out to her.

- Slagle asked Rheeder to send him a picture of her smiling face.

- Slagle then said, "You tell me what you want to do with me, and I will tell you what I want to do with you. I want to know if it's the same thing. I want to know if what I want is what you want."

- Rheeder put up her hands, exclaimed, "Whoa," and left Slagle's office.

**D. Rheeder and Slagle's Text Messages.** Over the next three days, Rheeder and Slagle exchanged text messages. Because we think the messages provide important context, we have reproduced them in full.

1. *January 9 text messages.*

| Sender | Time | Message Content |
|---|---|---|
| Slagle | 9:31 a.m. | Hey you! Haven't seen you today! |
| Rheeder | 9:32 a.m. | [emoji of smiling sun] |
| Slagle | 9:35 a.m. | I better see you. You are no stranger, at least I don't want you to be! |
| Rheeder | 9:36 a.m. | Hi! I have to keep my stranger title [emoji sideways smile] lol. Jokes. |
| Slagle | 9:36 a.m. | I will be a stranger to you? |
| Rheeder | 9:36 a.m. | Will check in. |
| Slagle | 9:37 a.m. | Haha-let's go with special and amazing |
| Rheeder | 9:38 a.m. | U will. |
| Slagle | 9:38 a.m. | Yes. Amazing. Simply. Naturally. |
| Rheeder | 9:38 a.m. | Ok. I will work on stranger thing. Maybe just "strange"? [emoji sideways smile] |
| | | No. I certainly hope not! |
| | 9:39 a.m. | Lol. Ok. Yes. That does sound better. But really?! |
| Slagle | 9:40 a.m. | I will take it! |
| Rheeder | 9:41 a.m. | Ooooooo. Thank you Doug! I will give you a fist bump for that one [emoji of smiley face and fist bump] |
| | 9:42 a.m. | Now I know why you make me nervous. |
| | | Brilliant. |
| Slagle | 9:57 a.m. | Well……. |
| | 10:11 a.m. | Ok. I shall be waiting…….. |
| | 10:12 a.m. | Deal |
| Rheeder | 10:13 a.m. | [emoji of smiling sun] |
| | | I need to mop some floors…. |
| | | Then…. |
| | | I will make my first attempt |
| | | [emoji of smiling face] |
| Slagle | 11:39 a.m. | Still waiting |
| | | Yes |
| | 11:40 a.m. | Please share |
| Rheeder | 11:40 a.m. | [smiling sun emoji] |
| Slagle | 11:40 a.m. | [emoji of tongue sticking out and winking face] |
| Rheeder | 11:41 a.m. | Question….if it takes me a dew [sic] text messages…. |
| | | Few |
| | 11:42 a.m. | Okay [sideways smiling emoji face] |
| Slagle | 11:43 a.m. | Yes. Why |
| Rheeder | 11:43 a.m. | [smiling face emoji] |
| Slagle | 11:43 a.m. | Oh boy |
| Rheeder | 11:43 a.m. | Ok. |

| Sender | Time | Message Content |
|---|---|---|
|  | 11:44 a.m. | So why does Doug cause me to feel nervous? [thinking emoji face] |
| Slagle | 11:45 a.m. | I get that. I understand. |
|  |  | Ok. Want to talk in person more? |
| Rheeder | 11:45 a.m. | Well….this is multi-sided |
| Slagle | 11:45 a.m. | Next |
|  |  | What's next |
|  |  | Anytime |
|  |  | Name it |
|  | 11:46 a.m. | Or you can share now |
|  |  | Ok. So…… |
| Rheeder | 11:47 a.m. | You are the deputy Chief of police department. I know you don't mean to be intimidating….but it just is. |
|  |  | Lol |
|  |  | Gosh this wpuld [sic] be easier in a conversation! |
| Slagle | 11:47 a.m. | See me tomorrow and we will figure out when and where you want to meet |
|  |  | Think of what is best for you. When and where |
| Rheeder | 11:47 a.m. | Ok. So point one covered [smiling face emoji] |
| Slagle | 11:47 a.m. | Deal?! |
| Rheeder | 11:47 a.m. | Yes please. |
| Slagle | 11:47 a.m. | Ok. Alone? At work? |
|  | 11:48 a.m. | When and where |
| Rheeder | 11:48 a.m. | Really? |
| Slagle | 11:48 a.m. | See you tomorrow! |
| Rheeder | 11:48 a.m. | Well…i do not wish to leave you with incomplete answer… |
|  |  | But it would be easier. |
|  |  | So when can I chat with Doug? |
| Slagle | 11:49 a.m. | [smiling emoji with heart eyes] |
| Rheeder | 11:49 a.m. | Ok. |
|  |  | Deal. |
|  |  | Deal….we will chat. |
|  | 11:50 a.m. | Sorry bad word |
|  |  | Ok. We figure out what is best time. |
|  |  | Yes. See you tomorrow! |
|  |  | [two smiling sun emojis] |

2. *January 10 text messages.*

| Sender | Time | Message Content |
|---|---|---|
| Slagle | 10:15 a.m. | Share |
| Rheeder | 10:16 a.m. | I very much want to |
|  |  | BUT I need to ask u some questions |

| | | |
|---|---|---|
| | | What does your afternoon lool [sic] like |
| | 10:17 a.m. | Look |
| Slagle | 10:17 a.m. | Share |
| | | Tell me one thing u want to do with me |
| Rheeder | 10:17 a.m. | Lol |
| | | Nope |
| | | [smiling face emoji] |
| Slagle | 10:17 a.m. | What time are u thinking and where |
| Rheeder | 10:18 a.m. | I will be busy till 1:15… |
| | | Then again from 3-3:15… |
| | | Library? |
| | | Park |
| Slagle | 10:19 a.m. | I have a 2:30 meeting |
| Rheeder | 10:20 a.m. | So 1:15 or 1:30 |
| Slagle | 10:20 a.m. | I have a 1-pm meeting also today |
| | | How about next week |
| Rheeder | 10:20 a.m. | As u wish |
| Slagle | 10:21 a.m. | I wish u tell me. Give me something then I will know if what I want is what u want |
| Rheeder | 10:22 a.m. | Then u tell me something |
| Slagle | 10:23 a.m. | Yes |
| Rheeder | 10:23 a.m. | U tell me something first |
| | | [smiley face emoji] |
| Slagle | 10:24 a.m. | No. U first |
| Rheeder | 10:25 a.m. | Doug… i know little about you…only ehat [sic] i see here. |
| | 10:26 a.m. | Sorry about my typos |
| | 10:27 a.m. | I can say that I am not like most people. |
| Slagle | 10:47 a.m. | What does that mean. Please share |
| Rheeder | 10:53 a.m. | Good question. [indecipherable emoji] |
| Slagle | 10:54 a.m. | And…. |
| Rheeder | 10:54 a.m. | Oh gosh. How long is your meeting |
| Slagle | 10:54 a.m. | Give me something…..like what |
| Rheeder | 10:55 a.m. | I am not flippant |
| | | I am not easy. |
| | | Two things [smiling face emoji] |
| Slagle | 10:56 a.m. | Not easy? |
| Rheeder | 11:03 a.m. | Lol. That word can go so many ways. |
| Slagle | 11:03 a.m. | So. Please explain |
| | | So I don't think bad things |
| Rheeder | 11:03 a.m. | Pls don't think bad things about me. |
| | | Are u at city hall? |
| Slagle | 11:04 a.m. | Yes |
| Rheeder | 11:04 a.m. | Are you finishing up? |

| Slagle | 11:05 a.m. | Soon. Why |
|---|---|---|
| Rheeder | 11:06 a.m. | O a |
| Slagle | 11:06 a.m. | Share which bad are u |
| Rheeder | 11:06 a.m. | Ops |
| | | I am the good bad |
| Slagle | 11:06 a.m. | What's that |
| Rheeder | 11:07 a.m. | I don't think u want that |
| Slagle | 11:07 a.m. | I want you as you are |
| Rheeder | 11:07 a.m. | But i am not bad |
| Slagle | 11:08 a.m. | Ok. I enjoy u |
| | | Got to go. Find me tomorrow |
| Rheeder | 11:09 a.m. | Mmm. ok. |
| | 11:16 a.m. | I will find my words |
| Slagle | 11:17 a.m. | I hope so!!!!! |
| Rheeder | 11:17 a.m. | If you have a few moments at work…. then i give you the words…. |
| | | [smiling face emoji] |
| Slagle | 11:17 a.m. | Yes. Find me tomorrow please. I enjoy you! |
| Rheeder | 11:18 a.m. | Ok. I will. But please tell me if timing bad. |
| Slagle | 11:19 a.m. | I shall & never |
| Rheeder | 11:20 a.m. | Like the way you said that [smiling face emoji] |
| Slagle | 11:23 a.m. | True |

At some point on January 10, Rheeder tried to speak to Slagle in his office, but their conversation was cut short. So they tried to find another time to meet. Rheeder joked that Slagle could just pull her over. Then, according to Rheeder, Slagle responded, "Yeah that would be great, I would put you in handcuffs and pat you down." Rheeder replied, "No, that wasn't what I had in mind."

That evening, Rheeder spoke with two of her coworkers about Slagle's conduct. Rheeder and Slagle's text messages resumed the next morning.

3. *January 11 text messages.*

| Sender | Time | Message Content |
|---|---|---|
| Rheeder | 8:32 a.m. | Good morning. Are u in meetings all morning? |
| Slagle | 8:33 a.m. | I am in my office awaiting your friendly smile |
| Rheeder | 8:39 a.m. | Lol. Ok. In a bit |
| Slagle | 8:40 a.m. | Ok |

Sometime between 8:40 and 9:40 a.m., Rheeder met with Slagle in his office again. Rheeder told Slagle that his conduct made her uncomfortable and asked him to stop. Slagle then apologized to Rheeder repeatedly. Slagle stated that his intent was not sexual in nature. Rather, he wanted to develop a friendship.

After this conversation, the two texted once more.

| Sender | Time | Message Content |
|---|---|---|
| Slagle | 9:40 a.m. | Thank you for sharing that time with me and being open and honest. I enjoy and value you! |
| Rheeder | 11:08 a.m. | You are welcome. I appreciate your input. Thank you for sharing with me about your life. |
| Slagle | 11:09 a.m. | Well. You are getting to know me better. For some reason I trust you. You may not like me as much the more you know! Be ready! |
| Rheeder | 12:02 p.m. | Yes I am getting to know you. That is ok..... I am able to handle it. Maybe you may not always like my responses. I told you i am not like most people. |
| Slagle | 12:04 p.m. | I completely enjoy and value you! I hope you don't find me too annoying or intimidating to the point you don't feel comfortable speaking and sharing with me! |
| Rheeder | 12:09 p.m. | No i do not find you annoying and no longer intimidating. I am grateful for our conversation. |
| Slagle | 12:10 p.m. | Then this will work my friend. Find me next week to say hey please. We can catch up from over the weekend! |
| Rheeder | 12:14 p.m. | Okay. Friends. Have a good weekend Doug. See you next week. |
| | | One question: |
| Slagle | 12:14 p.m. | Off to get a root canal |
| | | Yes?!? |
| | 12:15 p.m. | One answer |
| | | Haha |
| Rheeder | 12:15 p.m. | Lol |
| | | U are getting a root canal. Sorry abput [sic] that! |
| Slagle | 12:15 p.m. | No problem. Getting old |
| Rheeder | 12:16 p.m. | Haha. Not yet. |
| Slagle | 12:16 p.m. | I am. Old. |
| Rheeder | 12:17 p.m. | Nope |
| | | No excuses |
| Slagle | 12:18 p.m. | Xzzzzzzactly. Maybe just not getting any younger |

| Rheeder | 12:19 p.m. | [smiling emoji face] remember we are almost same age. |
|---|---|---|
| | 12:20 p.m. | Question: i need you to define "this" |
| | 12:21 p.m. | Yes... i am persistent |
| Slagle | 12:21 p.m. | This? |
| Rheeder | 12:21 p.m. | U wrote above. |
| Slagle | 12:22 p.m. | A friendship. I don't have many friends. |
| | | Is that okay? |
| Rheeder | 12:23 p.m. | Ok!! Very good. |
| | | Yes ok! |
| Slagle | 12:24 p.m. | Sweet! I just don't want to ever offend you, or anyone, nor intimidate nor make anyone feel uncomfortable |
| | 12:25 p.m. | I am odd. I get that. I don't want to offend or make anyone feel uncomfortable. Sometimes people talk to me because of my rank |
| | | So it's not friendly. They feel obligated |
| Rheeder | 12:28 p.m. | I get what you are saying. Burdens of position. I have no agenda. |
| Slagle | 12:29 p.m. | Thank you |
| Rheeder | 12:32 p.m. | Yes! |

After this exchange, the two stopped texting. According to Rheeder, these interactions caused her to become ill, vomit, and miss a day of work.

**E. The End of Rheeder and Slagle's Interactions.** Later the next week, Rheeder claims Slagle shook her hand, leaned in, and put his right cheek against her cheek. This prompted Rheeder to meet again with Slagle. Rheeder feared that Slagle may not have understood her intent during their January 11 conversation. So she told Slagle that she was still uncomfortable with Slagle's conduct. Slagle agreed to stop. This was their final conversation. And this was the end to all of Slagle's unwanted conduct toward Rheeder.

**F. Rheeder's Complaint Against Slagle and the Department's Investigation.** A couple of days later, on January 18, Rheeder submitted a complaint against Slagle. Rheeder submitted the complaint to Sergeant Hartwig, who was assigned to the department's office of professional standards. Rheeder reported that she felt Slagle's text messages were inappropriate. She said that Slagle was "sexually proposing something to her." Hartwig immediately took

Rheeder's complaint to Chief McHale. McHale and Hartwig then met with Rheeder.

McHale explained to Rheeder that the department could open a formal or informal investigation. Rheeder claims she asked for time to decide which option she wanted to pursue. But, according to Rheeder, this request upset McHale. She claims McHale pressured her into agreeing to an informal investigation.[1]

Although the parties dispute the scope and manner of the department's investigation, those disputes do not affect our analysis here. It is undisputed that the department conducted some investigation, including at least a review of Rheeder's text messages with Slagle.

It's also undisputed that, on January 22, Hartwig issued a memorandum to Rheeder informing her that the informal investigation had been completed. The memorandum said:

> Pursuant to the investigation of your complaint, it was apparent that texts and conversations occurred between yourself and Deputy Chief Slagle that were not related to the normal course of your duties. In respect to your request to end the conversations, Deputy Chief Slagle has been informed by the Chief of Police that no further communication or contact outside the performance of each of your official duties should occur.
>
> The Chief of Police has directly intervened in this situation to ensure both parties are able to perform their duties in a manner that is free from any form of harassment, real or perceived and to ensure each party has a distinct understanding of Operational Policy 738-01 Harassment and Discrimination.

---

[1] A quick note about formal and informal investigations in police departments. The defendants claim that McHale performed an informal inquiry pursuant to Iowa Code section 80F.1. *See generally* Iowa Code § 80F.1 (2019); *Smith v. City of Cedar Rapids*, 18 N.W.3d 490, 495 (Iowa 2025) (providing an overview of section 80F.1); *Chandler v. Iowa Dep't of Corr.*, 17 N.W.3d 645, 646–47 (Iowa 2025) (discussing the history of section 80F.1). Informal inquiries relate to "minor infractions of agency rules which will not result in removal, discharge, suspension, or other disciplinary action against the officer." Iowa Code § 80F.1(1)(*d*); *see also id.* § 80F.1(1)(*c*) (defining "informal inquiry"). If an informal inquiry does not result in the resolution of the allegation, a "formal administrative investigation" may be commenced. *Id.* § 80F.1(1)(*c*).

While the determination of "sexual harassment" as defined by policy 738-01 is unfounded in these conversations, the Chief of Police has directed both parties to cease all communications and contact. This should be considered a direct order intended to protect both parties. Any further contact by either Deputy Chief Slagle or yourself to communicate or correspond outside of the course of normal duties, will be considered a direct violation of this directive and subject to disciplinary action.

**G. Rheeder's Interactions with Gray in January.** Rheeder continued working as a custodian for the department, but she soon ran into problems with Gray. Rheeder claims there were run-ins on January 23 and 24.

1. *The January 23 incident.* Rheeder claims Gray approached her while she was cleaning on January 23. Gray asked to speak with Rheeder. Then Gray led Rheeder toward an elevator that was away from the department's surveillance cameras. Rheeder recalls that Gray was "shaking and visibly angry." Gray then gripped the top of Rheeder's shoulders. Gray told Rheeder that she should have come to Gray first about the complaint against Slagle. Gray explained that McHale was upset with Gray for not handling the complaint. Gray then removed her hands from Rheeder. And then, according to Rheeder, the following occurred:

- Gray told Rheeder that she was there to work, not to "speak to people."

- Then Gray told Rheeder to "never ever speak about this again." ("This" refers to Rheeder's sexual harassment complaint against Slagle.)

- And then Gray threatened Rheeder, "[I]f you speak [about this,] I will get you."

Later, Rheeder told a coworker about this exchange. According to the coworker, Rheeder's "eyes were watery," and she was "incredibly shaky," "visibly upset," and "scared half to death."

Then Rheeder told Kula about her interaction with Gray. Kula thought that Rheeder appeared upset and intimidated.

2. *The January 24 incident.* Rheeder alleges Gray approached her again on January 24. This time, Rheeder was cleaning an office. Rheeder describes the incident this way. First, Gray blocked the doorway, which made Rheeder feel as if she couldn't leave. Then, Gray insisted that Rheeder tell her who she told in the department about the sexual harassment complaint. Rheeder did not want to tell her, but Gray demanded to know. Rheeder said she had told Kula. Gray insisted on knowing who else. Rheeder then told Gray the names of the two other coworkers. And then Gray said, "[W]ell, whenever this gets out, whether it's like a month or two years from now, I'll know who to get or who to come after" and something to the effect of, "[I]f anybody speaks, . . . I will get them."

**H. Rheeder's May Interactions with Gray.** By early May, Slagle had resigned. But Rheeder was still uncomfortable around Gray. On May 6, Rheeder was told that she reported to Kula and did not have to report to Gray.

Around this time, though, Rheeder claims Gray used the kitchen where Rheeder was located even though Gray had never used that kitchen before. Rheeder thinks Gray did this "for the purpose of intimidating her."

On May 9, McHale and Gray met with Rheeder. Rheeder said she was not comfortable working with Gray. Gray apologized to Rheeder for Rheeder's perception of Gray's conduct. McHale assured Rheeder that she would no longer have to work with Gray.

But then, on May 13, another incident occurred while Rheeder was vacuuming. According to Rheeder, Gray walked directly toward her while maintaining eye contact to intimidate Rheeder. Rheeder claims she had to step out of Gray's way to avoid a collision.

**I. Rheeder's Complaints Against Gray.** In mid-May, Rheeder made a verbal complaint of retaliation and a hostile work environment to the City's

human resources department. Rheeder believed Gray was continuing to retaliate against her for making the January complaint against Slagle.

Later, Rheeder submitted a written complaint to the City. Rheeder recounted the two January incidents and the two May incidents with Gray.

Rheeder also wrote that she was "uncomfortable working with [Gray]." And Rheeder claimed that her health had been "deeply affected" by Gray's conduct. She said,

> I have missed work. I am unable to work because of panic, anxiety, nausea, migraines, dizziness, fear. I feel stressed and traumatized because of the events of the past 5 months. I am concerned for my safety and physical well-being. I am afraid both at work and outside of work.

The City began an investigation into Rheeder's complaints against Gray. From then on, Rheeder was granted leave, some paid and some unpaid.

**J. The City's Investigation of Rheeder's Complaints Against Gray.** A couple of weeks later, in early June, the City completed its investigation of Gray. The City found that Gray had committed no "materially adverse employment actions" against Rheeder and that Rheeder's complaint was "unfounded." As to the vacuum incident, the City said the video evidence "did not corroborate [Rheeder's] version of events." Nonetheless, the City told Rheeder that it "respects [her] concerns and has taken steps to address them." The City then stated, "[T]here shall be no one-on-one interactions between you and [Gray] without Mr. Kula's and/or Human Resources' presence." The City also offered to discuss other employment opportunities in the event that Rheeder felt that she could not continue working in the department.

Eventually, Rheeder's counsel notified the City that Rheeder would not be returning to work.

**K. Procedural History.** Rheeder filed employment discrimination and retaliation charges with the Iowa Civil Rights Commission against the City, McHale, Gray, and Slagle. Later, Rheeder filed this suit for sexual harassment and retaliation in violation of the ICRA. Her amended petition includes three counts. In Count I, Rheeder claims Slagle's unwelcome sexual harassment violated Iowa Code section 216.6 by creating a hostile work environment. In Count II, Rheeder claims the City violated the same section because it allowed Slagle's misconduct. In Count III, Rheeder claims that the City, McHale, and Gray retaliated against her in violation of section 216.11. Rheeder bases the retaliation claim on the following conduct: (1) McHale's written warning, (2) Gray's assaults and threats against Rheeder, (3) Gray's threats against Rheeder's coworkers, (4) Gray harassing Rheeder, and (5) constructive discharge.

The defendants moved for summary judgment on Rheeder's claims. The district court denied the defendants' motions for summary judgment as to all issues except constructive discharge. The defendants sought interlocutory review, which we granted.

**II. The Issues on Interlocutory Appeal.**

Although the defendants' briefs raise a variety of issues, we focus on the underlying conduct of Slagle, McHale, and Gray. Because we conclude that their conduct did not violate the ICRA, we need not address the remaining issues.

**III. Standard of Review.**

We review summary judgment rulings for correction of legal errors. Summary judgment is proper if there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. Iowa R. Civ.

P. 1.981(3). We view the record in the light most favorable to the nonmoving party. And we draw every reasonable inference in favor of the nonmoving party.

**IV. Analysis.**

We begin with a review of the ICRA's relevant provisions. Iowa Code ch. 216 (2019). Iowa Code section 216.6(1)(*a*) prohibits discrimination "in employment against . . . any employee because of the . . . sex" of the employee. Our cases hold that this section prohibits discriminatory "harassment that rises to the level of creating or maintaining a hostile work environment." *Valdez v. W. Des Moines Comm. Schs.*, 992 N.W.2d 613, 631 (Iowa 2023). Rheeder asserts that Slagle's sexual harassment created a hostile work environment.

The ICRA also prohibits some forms of retaliation. Iowa Code section 216.11(2) makes it unlawful to "retaliate against another person in any of the rights protected against discrimination by [the ICRA] because such person has lawfully opposed any practice forbidden under [the ICRA]." Rheeder asserts that McHale and Gray retaliated against her for making a sexual harassment complaint against Slagle.

We begin with Slagle's conduct before turning to McHale's and Gray's.

**A. Slagle.** Rheeder claims that Slagle's sexual harassment created a hostile work environment. "To establish a hostile-work-environment claim under the ICRA," a plaintiff must show (1) she "belongs to a protected group," (2) she "was subjected to unwelcome harassment," (3) "the harassment was based on a protected characteristic," and (4) "the harassment affected a term, condition, or privilege of employment." *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 571 (Iowa 2017) (quoting *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 746 (Iowa 2006)). Slagle's appellate arguments focus on the fourth element. As to

that element, we have said, "[T]he sexual harassment [must be] so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *State v. Watkins*, 914 N.W.2d 827, 843 (Iowa 2018) (quoting *McElroy v. State*, 637 N.W.2d 488, 499 (Iowa 2001)); *see also Farmland Foods, Inc. v. Dubuque Hum. Rts. Comm'n*, 672 N.W.2d 733, 743–44 (Iowa 2003). A plaintiff must show that she "subjectively perceived the conduct as abusive" and, in addition, "that a reasonable person would also find the conduct to be abusive or hostile." *Watkins*, 914 N.W.2d at 844 (quoting *Farmland Foods*, 672 N.W.2d at 744). This latter, reasonable-person inquiry is based on the totality of the circumstances, including "(1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating or whether it was merely offensive, and (4) whether the conduct unreasonably interfered with the employee's job performance." *Id.* (quoting *Farmland Foods*, 672 N.W.2d at 744–45).

Slagle argues that his conduct was not severe or pervasive enough to constitute actionable harassment. We agree.

Viewing the evidence in the light most favorable to Rheeder, we do find sufficient evidence that she felt subjectively harassed. And we take as true Rheeder's claims that she missed work, developed emotional and physical symptoms, and was stressed and fearful at work.

But when we view Slagle's conduct from an objective reasonable-person perspective, we do not think it was "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Id.* at 843 (quoting *McElroy*, 637 N.W.2d at 499); *see also Farmland Foods*, 672 N.W.2d at 743–44. Starting with the "frequency of the conduct," most of Slagle's conduct occurred over a few days in January 2019, although there were also some limited

interactions around November 2018. We view these more as "isolated events" than the kind of "ongoing and repeated conduct" necessary for a hostile-work-environment claim. *Farmland Foods*, 672 N.W.2d at 745 (citing *Nat'l R.R. Passenger Co. v. Morgan*, 536 U.S. 101, 115 (2002)).

Turning to the nature of Slagle's conduct, it involved some sexually suggestive conversation and minimal touching of Rheeder's face, hand, and foot. The most sexually charged comment by Slagle was: "You tell me what you want to do with me, and I will tell you what I want to do with you. I want to know if it's the same thing. I want to know if what I want is what you want." While some of Slagle's conduct would be offensive, it involved no physical threats or humiliations. Nor did Slagle's conduct "unreasonably interfere[] with [Rheeder's] job performance." *Watkins*, 914 N.W.2d at 844 (quoting *Farmland Foods*, 672 N.W.2d at 745).

In short, when we view Slagle's conduct from the objective reasonable-person perspective, it was not sufficiently severe or pervasive as to "amount to an alteration of the terms or conditions of employment" for Rheeder. *Id.* (quoting *Farmland Foods*, 672 N.W.2d at 745). Therefore, Slagle's conduct is not actionable.

This conclusion finds ample support in our prior opinions. For instance, Slagle's conduct is unlike the harassment in *Haskenhoff v. Homeland Energy Solutions, LLC*, where the plaintiff quit after being repeatedly harassed by her immediate supervisor. *See Haskenhoff*, 897 N.W.2d at 562; *see also White v. State*, 5 N.W.3d 315, 326 (Iowa 2024) (discussing *Haskenhoff*). In *Haskenhoff*,

> [The supervisor] repeatedly made inappropriate comments in Haskenhoff's presence. For example, [he] talked about Haskenhoff's breasts on at least three occasions, referring to them as "them puppies" or "the twins." [He] discussed Haskenhoff's body and attire with other employees and speculated out loud about what it would

be like to have sex with her. He insinuated to other male employees that they could get [Haskenhoff] into bed. He commented on the attractiveness or unattractiveness of female job applicants and employees. He spoke at work about strippers. On multiple occasions, he used objects or engaged in body motions in front of Haskenhoff to simulate sexual behavior.

Haskenhoff's coemployees also engaged in inappropriate conduct in her presence. One displayed a screen saver on his computer of two young girls touching tongues. Another photographed Haskenhoff's cleavage at a company outing and showed that photo to others. Haskenhoff received an unwanted pornographic video from yet another employee. The atmosphere Haskenhoff experienced at the [defendant's] plant was unseemly and unprofessional.

*Haskenhoff*, 897 N.W.2d at 562.

By contrast, Slagle's conduct was limited to minimal touching and a few sexually suggestive conversations that ended when Rheeder expressed that she was uncomfortable. So Slagle's conduct was neither as "repeated" nor as overt as that of Haskenhoff's supervisor. *See id.* Moreover, the "atmosphere [Rheeder] experienced" was plainly different. *Id.* Slagle's offensive conduct toward Rheeder involved no one else in the department. And no one else in the department "engaged in inappropriate conduct in [Rheeder's] presence." *Id.* Although Slagle was Rheeder's superior, his conduct falls short of the severe or pervasive conduct required to support a hostile-work-environment claim under our caselaw. *See id.*; *see also White,* 5 N.W.3d at 327, 331 (concluding that the supervisor's conduct was insufficient even though he commented that he dreamed of the plaintiff "wearing black leather and whipping" him and made multiple offensive comments in the plaintiff's presence about other women, including "wonder[ing] aloud whether to pray" that "a woman in a tight, short red dress" drops a pencil).

Even so, Rheeder claims that her case should come out differently because Slagle was aware that Rheeder had experienced domestic violence. Rheeder

reports that she had told Slagle about that experience during her job interview. And we do not doubt that Rheeder's experience as a domestic violence victim could be relevant to Rheeder's subjective perception of Slagle's conduct. But we do not believe that it changes our analysis here. Our analysis here concerns the objective severity and pervasiveness of Slagle's conduct when viewed from a reasonable plaintiff's perspective. *See Farmland Foods*, 672 N.W.2d at 744–45. To be sure, this objective evaluation of Slagle's conduct requires consideration of "all the circumstances" surrounding the conduct. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). But we think that those "circumstances" relate to the particular "social context" in which the conduct occurs, not the past experiences or sensitivities of the plaintiff. *Oncale*, 523 U.S. at 81–82.

In short, viewing all relevant circumstances in the light most favorable to Rheeder, Slagle's conduct was not sufficiently severe or pervasive to create a hostile work environment. The district court should have granted summary judgment to Slagle and the City as to Rheeder's discrimination claims.

**B. McHale and Gray.** We now turn to Rheeder's retaliation claims. Rheeder claims that McHale retaliated against her by issuing her a disciplinary memorandum after she submitted her sexual harassment complaint. And Rheeder claims that Gray retaliated against her through intimidating conduct in January and May 2019.

1. *Overview.* "A prima facie case of retaliation under the ICRA requires [a] plaintiff to establish (1) [s]he was engaged in statutorily protected activity, (2) [s]he was subjected to an adverse employment action, and (3) a causal connection between [her] participation in the protected activity and the adverse employment action." *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 28 (Iowa

2021). To establish a causal connection, a plaintiff must show that her protected activity was a significant factor contributing to the adverse employment action. *Haskenhoff*, 897 N.W.2d at 585. An action is not adverse just because the employee disagrees with it. *Farmland Foods*, 672 N.W.2d at 742.

This adverse-action requirement applies to both retaliation claims and discrimination claims. But the scope of behaviors that can constitute "adverse action" is broader in the retaliation context than in the discrimination context. In the discrimination context, adverse actions must be employment-related. *Godfrey v. State*, 962 N.W.2d 84, 109 (Iowa 2021). "The plaintiff must show the defendants took adverse action that detrimentally affected the material terms, conditions, or privileges of the plaintiff's employment." *Id.*; *see also Haskenhoff*, 897 N.W.2d at 587 (providing examples like "disciplinary demotion, termination, [or] unjustified evaluations and reports" (quoting *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 863 (Iowa 2001))). In the retaliation context, however, adverse actions *can* be employment-related, but they don't have to be. *Godfrey*, 962 N.W.2d at 109. Even so, "the adverse action must still be *material.*" *Id.*; *see also Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). In other words, "the adverse action must produce an actual 'injury or harm' to the plaintiff." *Godfrey*, 962 N.W.2d at 109–10 (quoting *Burlington N.*, 548 U.S. at 67); *see also Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 644 (8th Cir. 2009). "And the actual injury or harm must be sufficiently severe such that it would 'dissuade a reasonable person from making or supporting an allegation of discrimination or harassment.'" *Godfrey*, 962 N.W.2d at 110 (quoting *Haskenhoff*, 897 N.W.2d at 588–89); *see also Burlington N.*, 548 U.S. at 68 (setting forth the standard). This objective inquiry "depends upon the circumstances of the particular case," *Burlington N.*, 548 U.S. at 71, and "should

be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,' " *id.* (quoting *Oncale,* 523 U.S. at 81). *See also Haskenhoff*, 897 N.W.2d at 587 (same).

One final principle. Like with discrimination claims, a plaintiff can assert a retaliation claim based on discrete acts or based on a hostile work environment. Between these two options, the main difference is that hostile-work-environment claims involve "repeated conduct" and the "cumulative impact of separate acts." *Godfrey*, 962 N.W.2d at 110 (quoting *Farmland Foods*, 672 N.W.2d at 741). Discrete-act claims, by contrast, involve individual acts that are "separately actionable." *Id.* (quoting *Farmland Foods*, 672 N.W.2d at 741). Although we addressed this difference in *Godfrey*, we have not yet been required to fully delineate the elements of a retaliatory hostile-work-environment claim under Iowa law. *See id.* Nor does the present case require us to do so. For the present case, we need only say that the adverse action requirement, as explained above, applies equally to claims of discrete-act retaliation and a retaliatory hostile work environment. *See id.*[2]

With these principles in mind, we turn to McHale's and Gray's conduct.

2. *McHale.* Rheeder views McHale's memorandum as a retaliatory written warning. Rheeder focuses on this language in particular:

> [T]he Chief of Police has directed both parties to cease all communications and contact. This should be considered a direct

---

[2]The parties direct us to a split of authority in the federal courts of appeals on Title VII retaliation claims. But that split concerns whether the more stringent "severe or pervasive" element applicable to hostile-work-environment *discrimination* claims should also apply to *retaliatory* hostile-work-environment claims. *Compare Menoken v. Dhillon*, 975 F.3d 1, 5–7 (D.C. Cir. 2020) (analyzing the severe-or-pervasive element in addition to the *Burlington Northern*, 548 U.S. 53, standard), *with Stratton v. Bentley Univ.*, 113 F.4th 25, 43 (1st Cir. 2024) (rejecting the application of the severe-or-pervasive element and applying only the *Burlington Northern*, 548 U.S. 53, standard). And because we resolve Rheeder's retaliation claims without resort to the severe-or-pervasive element, we need not decide whether it applies to retaliatory hostile-work-environment claims.

order intended to protect both parties. Any further contact by either Deputy Chief Slagle or yourself to communicate or correspond outside of the course of normal duties will be considered a direct violation of this directive and subject to disciplinary action.

The memorandum was issued to both Slagle and Rheeder. But Rheeder does not believe the memorandum should have been issued to her because, in her view, it effectively blames her for making a complaint against Slagle.

Without more, we cannot conclude that Rheeder's receipt of the memorandum amounts to an adverse action. *See Haskenhoff*, 897 N.W.2d at 589–90 (collecting cases and noting that "a majority of circuits . . . have held that a reprimand or performance improvement plan, without more, cannot be considered an adverse employment action under *Burlington Northern*," 548 U.S. 53). Rheeder points to no injury or harm. *See Godfrey*, 962 N.W.2d at 109–10. The memorandum did not change Rheeder's hours, pay, professional advancement, duties, or status. *Cf. Haskenhoff*, 897 N.W.2d at 590 (concluding that a "performance improvement plan, alone, did not cause" material harm); *Hill v. City of Pine Bluff*, 696 F.3d 709, 715 (8th Cir. 2012) (holding that a written warning was not materially adverse where it did not "threaten termination or any other employment-related harm").

It's true that the memorandum prohibited further contact with Slagle outside the scope of normal business duties. But context matters. Rheeder had made a complaint against Slagle because of unwanted interactions in the workplace. For instance, Rheeder mentioned her text exchanges with Slagle. Rheeder wanted interactions like these to stop. So McHale, attempting to "protect both parties," ordered the two of them to cease all non-work-related contact or be subject to disciplinary action. This would address, at least in part, Rheeder's expressed need—no more improper interactions with Slagle. And although, in

theory, Rheeder could be disciplined going forward for talking with Slagle outside of normal business duties, no discipline was imposed against Rheeder.

At bottom, Rheeder believes that the memorandum should have been focused solely on Slagle's conduct and issued to Slagle only. Under the circumstances here, though, Rheeder's mere disagreement with the scope and wording of the memorandum is not enough to make it an adverse action. *See Farmland Foods*, 672 N.W.2d at 742.

The district court should have granted summary judgment on Rheeder's retaliation claims against McHale and any derivative claim against the City.

3. *Gray.* Gray claims that her actions against Rheeder in January and May 2019 cannot be considered materially adverse. We agree.

To recap, Rheeder alleges that on January 23, Gray grabbed her by the shoulders, told her that she should have talked to Gray first, told her that she should never talk about the complaint again, and told her that Gray would "get her" if she talked about the complaint. On January 24, Gray blocked Rheeder from exiting an office. Gray then threatened to "come after" and "get" Rheeder's coworkers (the three coworkers that Rheeder had confided in about the complaint) if they talked about Rheeder's complaint. In addition, Rheeder points to Gray's alleged intimidation tactics in May—the kitchen and vacuum incidents. Rheeder alleges that Gray's conduct caused her to miss work and caused symptoms such as fear, nausea, and migraines.

We do not believe that Gray's actions—either viewed individually or collectively—constitute a materially adverse action. Again, a materially adverse action is an action that (1) produces an actual injury or harm that is (2) sufficiently severe to "dissuade a reasonable person from making or supporting an allegation of discrimination or harassment." *Godfrey*, 962 N.W.2d

at 109–10 (quoting *Haskenhoff*, 897 N.W.2d at 588–89); *see also Burlington N.*, 548 U.S. at 67–68. At the outset, we view the vacuum and kitchen incidents as similar to those unactionable "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68.

Gray's threats on January 23 and 24 present a closer question. We accept as true Rheeder's assertion that Gray's conduct caused her fear and other symptoms and caused her to miss work. But Rheeder's subjective response to Gray's conduct does not necessarily transform it into something objectively injurious or harmful. Gray did not physically injure Rheeder. *Cf. Est. of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004) (holding that a punch in the chest could qualify as an adverse employment action). Gray also did not harm Rheeder's property. *Cf. Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347–49 (6th Cir. 2008) (permitting the plaintiff's retaliation claim against her employer where a coworker set the plaintiff's car on fire following her submission of a sexual harassment complaint against the coworker and where the employer knew about the incident but failed to investigate). And Gray also did not change any of Rheeder's employment conditions. *Cf. Burlington N.*, 548 U.S. at 70–73 (affirming the jury's findings of retaliation where the plaintiff complained of gender discrimination and was then reassigned from her forklift duties to more arduous and dirtier work, and also where the plaintiff was placed on a thirty-seven-day suspension without pay). Indeed, Gray's threats were so vague that we cannot say that they were even threats of something that would be objectively injurious or harmful. *See, e.g., Lewis v. Wilkie*, 909 F.3d 858, 870 (7th Cir. 2018) (holding that an unfulfilled threat of discipline, taken alone, is not a materially adverse action); *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (concluding that the plaintiff's superiors' "threats of unspecified disciplinary

action [did] not constitute adverse actions, at least not in this context" where the threats produced no injury and "had no effect on [the plaintiff's] compensation or career prospects"). *But see Chillmon v. Village of Evergreen Park*, 692 F. Supp. 3d 834, 852–53 (N.D. Ill. 2023) (finding a fact question as to whether a chief of police's threat to terminate a record clerk's employment and sabotage her future employment opportunities was an adverse employment action).

We recognize that Gray's conduct was not strictly verbal. Rather, as Rheeder emphasizes, Gray allegedly grabbed Rheeder's shoulders. Even so, we think Gray's conduct is somewhat similar to the supervisor's unactionable conduct in *Boucher v. Saint Francis GI Endoscopy, LLC*, 202 A.3d 1056, 1060–61, 1065–67 (Conn. App. Ct. 2019), *abrogated on other grounds by Karagozian v. USV Optical, Inc.*, 238 A.3d 716 (Conn. 2020). In *Boucher*, a supervisor told the plaintiff that her sexual harassment complaint "[did not] add up," asked her to repeat the conduct described in the complaint, and told her that she was going to give her an unspecified warning (but never actually did). *Id.* at 1060 (alteration in original). The plaintiff then stood up and said she was quitting. *Id.* The supervisor asked the plaintiff to sit down again, grabbed the plaintiff's arms, and said, "Are you sure you want to do this?" *Id.* The Appellate Court of Connecticut concluded that the supervisor's actions, "individually or in the aggregate," did not "constitute a materially adverse employment action." *Id.* at 1065–67. We conclude the same as to Gray.

The district court should have granted summary judgment on Rheeder's retaliation claims against Gray and any derivative claim against the City.

4. *Conclusion.* We have considered these defendants' behaviors both as individual acts and in the aggregate. Either way, their behaviors do not amount to a materially adverse action as required for a retaliation claim under Iowa law.

So the district court should have granted summary judgment as to Rheeder's retaliation claims (count III).

**V. Disposition.**

The district court erred in denying the defendants' motions for summary judgment. We reverse and remand for dismissal.

**Reversed and Remanded.**